Tommy **CHAMPION**, Appellant,

v.

## GREAT DANE LIMITED PARTNERSHIP, Appellee.

No. 14–08–00310–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 7, 2009.

Richard L. Lagarde, Roger N. Chrisco, Houston, for Appellant.

William C. Book, LeAnn Kay, Houston, for Appellee.

Panel consists of Chief Justice HEDGES, Justice FROST, and Senior Justice HUDSON.*

## OPINION

KEM THOMPSON FROST, Justice.

The underlying products-liability case arose from injuries sustained by appellant, a truck driver, in attempting to unload a truck trailer manufactured by appellee. The truck driver complains on appeal that

---

\* Senior Justice J. Harvey Hudson sitting by assignment.

the trial court erred in excluding testimony from his expert witness as to the trailer's alleged design defect and in granting a motion for a directed verdict in favor of the manufacturer on the design-defect claim. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Tommy Champion, a truck driver, filed suit against appellee Great Dane Limited Partnership (hereinafter "Great Dane") for injuries he sustained in an incident involving a truck trailer manufactured by Great Dane. The trailer was owned by Penske Trucking Leasing Company,[1] which leased the trailer to Champion's employer.

Great Dane designed and manufactured the refrigerated trailer according to Champion's employer's specifications. The trailer had ridged flooring that allowed cold air to circulate beneath the freight. An uncovered gutter[2] spanned the width of the trailer in the rear, which allowed for condensation and liquids from leaky freight to drain away from the freight. Liquids flowed into drainpipes on each side of the gutter to prevent pooling. A "lift gate platform" was attached to the rear of the trailer, which facilitated loading and unloading cargo. Champion had not used this particular trailer before the incident in question.

On the day of the incident, Champion was transporting freight that did not require refrigeration. He was scheduled to deliver pallets of freight to several locations. He was supposed to use a pallet jack[3] to pull the load off of the trailer. At the first location, Champion discovered the lift gate platform attached to the trailer was not level. He noted on a vehicle inspection form that "this ramp needs to be fixed, drops downhill." During the course of Champion's trip, he unloaded about twelve to fifteen pallets before arriving at his last stop. He used a pallet jack to unload these pallets and encountered no problems in crossing the trailer's gutter, although he admitted the pallets were relatively light. He explained at trial that in unloading these pallets, the wheels of the pallet jack "hit" the gutter and "bumped" the gutter, so that the pallet jack "bounced across" the gutter as he pulled cargo out of the trailer.

Champion's last load was to be delivered to Filter Fresh Coffee in San Antonio, where he was to unload four pallets. Although he unloaded the first two pallets without incident, he "hit" the gutter both times. The third and fourth pallets contained bottled water and cans of coffee, which were wrapped in plastic "shrinkwrap." These pallets were heavier and stacked higher than the other pallets. Champion slid the forks of the pallet jack under the third pallet and used the pallet jack to lift the pallet off of the trailer's floor. The pallet became unstable and almost fell as he maneuvered to the lift gate platform. Champion attributed the unstable load to the wheels of the pallet jack, which he claims became lodged in the trail-

---

1. Although Champion also asserted claims against Penske and another party, the record reflects that Champion accepted settlement offers from those two parties and that the claims against those parties were dismissed with prejudice.

2. The parties used the terms "gutter" or "drain" interchangeably in reference to this open space. For consistency, we use the term

"gutter." The gutter measured approximately 2–1/3 inches wide and 1–1/4 inches deep.

3. The parties refer to a pallet jack as a manually-operated piece of equipment that allows a single operator to place fork-like arms beneath a pallet, lift the pallet with the aid of hydraulics, and move the pallet on small wheels.

er's gutter. Filter Fresh Coffee employees assisted Champion by removing some of the bottled water from the pallet. He then moved the pallet into the Filter Fresh Coffee building.

In unloading the last pallet, Champion lifted and moved the pallet and approached the lift gate platform from within the trailer. The wheels of the pallet jack fell into the gutter at the rear of the trailer. The palletized load shifted, and Champion stabilized it with his hands. Champion "wiggled" the load and then used the pallet jack hydraulics to lower the load. He pulled back so that the pallet jack wheels were clear of the gutter and then lifted the load with the pallet jack. Champion maneuvered onto the lift gate platform, where the pallet jack rolled 6–7 inches on its own. He then heard a "pop." [4] The lift gate platform dropped several inches. Champion lowered the load to prevent the pallet jack from rolling off the end of the lift gate platform, and boxes fell from the pallet, hitting him in the head and knocking out some of his teeth. He jumped off of the trailer and injured his heel, ankle, elbow and thumb. Champion underwent numerous surgeries for his injuries.

Champion brought suit against Great Dane, among others, alleging causes of action for negligence, strict liability for a design defect and marketing defect, breach of warranty, and gross negligence. He complained that the trailer's uncovered gutter subjected him to an unreasonable risk of harm. At trial, Champion sought to elicit testimony from an expert witness regarding alleged marketing and design defects of the trailer's gutter. The expert witness testified briefly; however, the trial court excluded the expert's testimony as to

defective design and permitted the expert to testify only for marketing defect.

At the close of Champion's evidence,[5] by oral motion, Great Dane moved for a directed verdict on Champion's defective-design claim. Great Dane argued that Champion failed to produce evidence of a safer alternative design for the trailer's gutter and that had the safer alternative design existed, Champion presented no evidence that it would have prevented the injuries he sustained. The trial court granted this motion.

The trial court submitted questions to the jury on Champion's marketing-defect and negligence claims. The jury returned a verdict in favor of Great Dane, concluding that Champion was 100% negligent and responding "no" to a question regarding marketing defect. The trial court entered a "take nothing" judgment in favor of Great Dane, confirming the jury's verdict. Champion now appeals, asserting that the trial court erred in excluding the expert's testimony and in granting Great Dane's motion for directed verdict.

## II. Issues and Analysis

### A. Did the trial court err in granting a directed verdict for the manufacturer on the issue of design defect?

In his first issue, Champion argues that the trial court erred in granting Great Dane's oral motion for a directed verdict on the issue of design defect.

■ A trial court may instruct a verdict in favor of a defendant if no evidence of probative force raises a fact issue on the material questions in the suit. *See Prudential Ins. Co. of Am. v. Fin. Review*

---

4. Although he could not determine the source of the noise, Champion said the noise could have been attributed to kinks in the chain that attached the lift gate platform to the trailer.

5. Champion had rested subject to calling Champion's wife as a witness the following day.

*Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). A directed verdict in favor of a defendant may be proper when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery; or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See id.* We review the trial court's granting of a directed verdict by following the same standard for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 809–828 (Tex.2005). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the nonmovant and indulge every reasonable inference that would support the verdict. *Id.* at 823. When reviewing a directed verdict, we must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827.

■ In his live petition, Champion alleged, among other things, strict liability in design defect of the trailer's "uncovered floor gutter at the rear of the trailer that interfered with the transportation of loads out of the trailer." A design defect renders a product unreasonably dangerous as designed, thereby warranting strict liability, when taking into consideration the utility of the product and the risk involved in its use. *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999).

■ To establish a design defect, Champion had to show by a preponderance of the evidence that (1) there was a safer alternative design; and (2) the defect was the producing cause of the personal injury. TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 2005). A "safer alter-

native design" under section 82.005[6] of the Texas Civil Practice and Remedies Code means that a product design other than the one at issue would have prevented or significantly reduced the risk of injury without substantially impairing the product's utility and that the safer alternative design was both technologically and economically feasible when the product left the control of the manufacturer. *Id.* § 82.005(b); *see Sanchez,* 997 S.W.2d at 588. Generally, the requirements to prove a design defect necessitate competent expert testimony and objective proof that a defect caused the injury. *See Nissan Motor Co., Ltd. v. Armstrong,* 145 S.W.3d 131, 137 (Tex.2004) (concluding this premise was not peculiar to unintended acceleration cases); *DeGrate v. Executive Imprints, Inc.,* 261 S.W.3d 402, 410–11 (Tex. App.-Tyler 2008, no pet.) (providing that an expert's conclusory statements as to design defect are not competent evidence and are insufficient to defeat or support summary judgment for design defect).

■ Great Dane moved for a directed verdict, alleging that Champion offered no evidence of a safer alternative design that was both technologically and economically feasible when the trailer left Great Dane's control in 1999. Great Dane also alleged that Champion offered no evidence that a safer alternative design, had it existed, would have prevented Champion's injuries. The trial court granted Great Dane's motion.

At trial, Champion sought to show that the trailer was defectively designed because of the hazard created when the wheels of a pallet jack became lodged in the trailer's rear gutter in the course of

---

**6.** Unless otherwise specified, all references to a "section" are to the Texas Civil Practice and Remedies Code.

loading and unloading cargo.[7] On appeal, Champion maintains that he produced evidence of safer alternative designs because James Hofstetter, Great Dane's Vice President of Product Safety and Compliance, testified that Great Dane manufactures refrigerated trailers without any gutters or with gutters located in the front of the trailer. He also points to testimony from both Hofstetter and Greg Scoggins, another representative for Great Dane, who testified about "dock plates"[8] that cover the gutters in refrigerated trailers. Finally, as evidence of a safer alternative design, Champion points to his own testimony about his experience in the 1970s and 1980s driving a refrigerated trailer with a mesh grate that covered the rear gutter, a trailer that was not manufactured by Great Dane.[9]

### 1. *Alternative Designs of a Trailer Without Any Gutters or with No Rear Gutter*

As evidence of an alternative design, Champion points to Hofstetter's testimony that a refrigerated trailer without any gutters would have reduced or eliminated the risk of injury in this case. Although Hofstetter testified that, at a customer's request, Great Dane had manufactured a refrigerated trailer with flat flooring and no gutters, that design was an entirely different class of flooring for refrigerated trailers, and unlike the trailer in this case, which featured ridged flooring. *See, e.g., Allen v. W.A. Virnau & Sons, Inc.*, 28 S.W.3d 226, 232–33 (Tex.App.-Beaumont 2000, pet. denied) (providing that safer alternative design did not diminish utility of product involving *same* model tractor). Furthermore, Scoggins testified that a trailer without any gutter is not feasible in this type of trailer with ridged flooring. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(2) (requiring technological and economic feasibility for an alternative design); *Smith v. Aqua–Flo, Inc.*, 23 S.W.3d 473, 477 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (requiring separate proof for technological and economic feasibility); *see also Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex. 1998) (providing that a safer alternative design must be implemented without de-

---

7. The record reflects that Great Dane representatives discouraged use of pallet jacks on the type of ridged flooring found in this refrigerated trailer because the pallet jacks damaged the floor. Great Dane manufactures refrigerated trailers with flat floors intended for use with pallet jacks.

8. Although at trial the parties referred to two different kinds of dock plates used by trailers, a "dock plate" as used in this circumstance is an L-shaped piece of metal that is several inches wide. The shorter piece of metal rests in the gutter of the trailer, and the longer piece covers the open gutter and is tack-welded to the trailer's ridged floor. The dock plates are evenly spaced across the threshold of the gutter to cover the gutter in spots, but not entirely. The dock plates were designed by Great Dane to protect the edges of the ridged flooring where the ridged flooring meets the gutter when loading and unloading cargo at a warehouse loading dock.

9. At submission, Champion made reference to a fifth alternative design, filling the gutter with square boxed tubing. Champion claims evidence of this design was raised at trial through the testimony of a representative of the manufacturer of the lift gate platform. However, Champion, in his appellate brief, neither identified nor addressed this fifth alternative design and he has provided no analysis or citations to the record or legal authorities as to this alternative design. Therefore, Champion has waived this issue. *See* Tex. R. App. P. 38.1(h); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex.App.-Houston [14 Dist.] 2005, no pet.) (holding that, even though courts interpret briefing requirements reasonably and liberally, a party asserting error on appeal still must put forth some specific argument and analysis citing the record and authorities in support of the party's argument).

stroying the utility of the product). Champion claims he is entitled to a reasonable inference as to economic feasibility of this design even though he acknowledges in his appellate brief that Hofstetter did not explicitly testify regarding the economic feasibility of a refrigerated trailer without any gutters. But because technological feasibility and economic feasibility are different concepts, separate proof is required for each. *See Smith,* 23 S.W.3d at 477. Champion points to no other evidence that an alternative design of a refrigerated trailer with this type of ridged flooring but without any gutters was either technologically or economically feasible when it left Great Dane's control in 1999. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b)(2) (requiring technological and economic feasibility); *Smith,* 23 S.W.3d at 477 (requiring separate proof for technological and economic feasibility). On this record, Champion has not produced evidence to show that this alternative design would be a safer alternative design as contemplated by section 82.005(b). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b); *Smith,* 23 S.W.3d at 480–81 (concluding directed verdict on design-defect claim was proper); *see also General Motors Corp. v. Harper,* 61 S.W.3d 118, 130, 133 (Tex.App.-Eastland 2001, pet. denied) (concluding evidence was legally insufficient to support a safer alternative design).

Champion claims he is entitled to a reasonable inference from the evidence that an alternatively designed trailer without a rear gutter would have reduced or eliminated the risk of pallet-jack wheels "falling" into the rear gutter. Champion's contention that utilization of this alternative design might have avoided injuries does not prove that the trailer was defective. *See Harper,* 61 S.W.3d at 124–25. In reference to the feasibility of an alternative design with only a front gutter and no rear gutter, Hofstetter testified that customers should be told of potential problems that may arise without a drain in the rear. Hofstetter acknowledged one problem with this design is that because the trailer naturally slopes downward toward the rear, liquid can pool there. Hofstetter explained that without a rear gutter to drain the liquid, the trailer's refrigeration system may cause the liquid to freeze, which would pose a potential hazard for slipping or falling. As a general rule, a manufacturer should not be liable for failing to adopt an alternative design that, in some circumstances, would impose an equal or greater risk of harm. *See Uniroyal Goodrich Tire Co.,* 977 S.W.2d at 337–38. To prevail on his design-defect claim with this alternative design, Champion was required show that the safety benefits from his proposed alternative design would not impose an equal or greater risk of harm. *See id.* The safety benefits of the alternative design must be "foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety." *Id.* Champion has not pointed to any evidence that the safety benefits from this proposed alternative design would not impose an equal or greater risk of harm. *See id.* at 338. Champion has not offered evidence to demonstrate that the alternative design was as safe as the current design in terms of protecting from risk of injury. *See Harper,* 61 S.W.3d at 124–25. Furthermore, Champion points to no other evidence in the record that establishes this alternative design would reduce the risk of injury without substantially impairing the utility of the gutter for this trailer with ridged flooring. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b)(1); *Harper,* 61 S.W.3d at 128 ("Unsupported statements that an alternative design would be safer is not evidence."). Champion has not met the burden of showing that this alternative design would be a safer alternative design

as contemplated by section 82.005(b). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b); *see also Smith*, 23 S.W.3d at 480 (affirming directed verdict granted on design defect claim); *Harper*, 61 S.W.3d at 130.

### 2. *Alternative Designs of a Trailer with a Covered Gutter*

 Champion claims he is entitled to a reasonable inference from the evidence that an alternatively designed trailer with a covered rear gutter would have reduced or eliminated the risk of pallet-jack wheels "falling" into the rear gutter. He points to his own trial testimony that a steel mesh covering [10] like the covering he saw in the 1970s would have reduced the risk of the hazard. However, Champion acknowledged that the trailer in the 1970s was not manufactured by Great Dane and that he did not use a pallet jack to unload cargo at that time. *See, e.g., Allen*, 28 S.W.3d at 232–33 (involving safer alternative design implemented on same model tractor); *see also Harper*, 61 S.W.3d at 127 (concluding a test constituted no evidence that an alternative design for seat-belt webbing would protect a driver from the principal risk of impacting a steering wheel when test did not involve steering wheels or steering columns). The fact that another manufacturer uses an alternative design may be evidence of the technical feasibility of that design. *See Honda of Am. Mfg., Inc. v. Norman*, 104 S.W.3d 600, 607 (Tex. App.-Houston [1st Dist.] 2003, pet. denied). However, economic feasibility refers to the cost of producing a particular design. *Id.* Absent testimony that an alternative design is economically feasible, evidence suffices to support a directed verdict. *Smith*, 23 S.W.3d at 477. Even if we were to presume without deciding that Champion was a qualified witness to testify to this alternative design, both Hofstetter and Scoggins rejected the technological and economical feasibility of a metal grate covering in refrigerated trailers designed by Great Dane.[11] *See Smith*, 23 S.W.3d at 477 (requiring separate proof for technological and economic feasibility); *see also Nissan Motor Co., Ltd.*, 145 S.W.3d at 137 (indicating that expert testimony may be necessary to prove a design defect). Hofstetter testified that a steel or aluminum grate for gutters in Great Dane's trailers was neither technologically nor economically feasible because such metals posed problems of corrosion, added extra weight, and would need to be very thick to sustain heavy loads. Champion does not point to any other evidence that such grates would be technologically or economically feasible in 1999, when this trailer left Great Dane's control. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b)(2); *Smith*, 23 S.W.3d at 478. Therefore, Champion has not shown that this alternative design would be a safer alternative design under section 82.005(b). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(b); *Smith*, 23 S.W.3d at 480; *see also Harper*, 61 S.W.3d at 130.

 Finally, Champion claims that use of the "dock plates" manufactured by Great Dane would have reduced or eliminated the risk of injury. However, "[u]nsupported statements that an alternative design would be safer is no evidence." *Harper*, 61 S.W.3d at 128. At trial, Hofstetter testified that alternative designs to prevent pallet jack wheels from "falling" into the gutter could not be implemented

---

10. Champion described this alternative design at trial as a piece of steel or "wire mesh" with diamond-shaped square holes.

11. Champion's attorney questioned Hofstetter about an alternative design involving a metal grate, made of aluminum or steel, which he described as being similar to a grate used in a barbecue pit.

without seriously affecting the utility of the trailer's ridged floor. Hofstetter admitted that it was technologically and economically feasible to manufacture dock plates, because Great Dane manufactures such devices for other purposes, and installs them only at a customer's request. However, Hofstetter and Scoggins each explained that dock plates are evenly spaced across the threshold of the gutter, but not spanning the entire gutter. No evidence reflects that the use of dock plates, when used as intended and spaced evenly over the gutter, would reduce or eliminate the hazard of pallet-jack wheels "falling" into the gutter. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(1); *see, e.g., Harper,* 61 S.W.3d at 130. Therefore, Champion has not produced evidence to show that this alternative design, featuring dock plates spaced evenly across the gutter's threshold, would be a safer alternative design as contemplated by section 82.005. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 82.005; *see also Harper,* 61 S.W.3d at 130. To the extent that Champion suggested at trial that dock plates may be used to cover the gutter entirely, when shown a picture of a gutter with a solid metal cover over the entire gutter, Hofstetter indicated that such a design was not technologically feasible because the drains and gutter need to be accessible for cleaning or else liquid will collect in the floor and freeze.[12] *See Uniroyal Goodrich Tire Co.,* 977 S.W.2d at 337 (providing that a manufacturer should not be liable for failing to adopt an alternative

design that would impose an equal or greater risk of harm); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b)(2)(requiring feasibility). On this record, no evidence reflects that the use of dock plates to cover the gutter entirely is a safer alternative design under section 82.005(b). *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b); *Smith,* 23 S.W.3d at 480; *see also Harper,* 61 S.W.3d at 130.

Furthermore, the record contains no expert testimony that any of the proposed alternative designs satisfied both requirements of subsection 82.005(b) as a safer alternative design. *See Nissan Motor Co., Ltd.,* 145 S.W.3d at 137; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.005. Even presuming without deciding that Champion has met the requirements of section 82.005(b), the requirements to prove a design defect generally necessitate competent expert testimony and objective proof that a defect caused the injury. *See Nissan Motor Co., Ltd.,* 145 S.W.3d at 137. Although Champion suggested at submission that no expert witness was necessary, as discussed above, no lay witness testimony established that any of these alternative designs would meet all of the requirements of section 82.005—particularly in light of Champion's own testimony at trial that (1) the trailer's ridged flooring and gutter did not have any influence over his pallet jack or whether it would roll toward him; and (2) had the lift gate platform not malfunctioned, the accident would not have occurred.[13] *See* Tex. Civ. Prac. & Rem.

---

12. Furthermore, Hofstetter could not determine from the picture whether the trailer in the photo had ridged flooring like the trailer at issue in this case. At submission, Champion suggested that Great Dane could have manufactured wider dock plates to span the length of the gutter, leaving only the ends of the gutter near the drain exposed. Champion does not point to evidence in the record that this design was raised as an alternative design

at trial. Likewise, Champion did not identify this alternative design in his appellate brief nor address how this design meets the requirements of section 82.005. *See* Tex. R. App P. 38.1(h); *San Saba Energy, L.P.,* 171 S.W.3d at 338.

13. In his appellate brief, Champion points to his testimony at trial that the accident would not have occurred if the rear gutter had been

CODE ANN. § 82.005(a)(2) (requiring proof of producing cause). In this case, no expert evidence established that the trailer or gutter was the producing cause of Champion's injuries, as contemplated by subsection 82.005(a)(2)—especially when considering evidence in the record that Champion's palletized load stabilized after encountering the gutter and before it was maneuvered onto the lift gate platform. *See id.*

Therefore, because on this record, no evidence of probative force raised a fact issue on the material questions as to design defect, the directed verdict in favor of Great Dane was proper. *See Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *Smith*, 23 S.W.3d at 480. Accordingly, we overrule Champion's first issue.

**B. Did the trial court commit reversible error in excluding expert testimony?**

■ In his second issue, Champion argues the trial court abused its discretion in excluding the testimony of expert witness, Dr. Waymon Johnston, regarding design defect. Dr. Johnston testified briefly; however, the trial court excluded his testimony as to defective design and permitted him to testify only about marketing defects and warnings. Dr. Johnston's deposition testimony, however, was included in the record for our review.

The trial court has broad discretion to determine the admissibility of evidence; as such, a reviewing court will reverse only if there is an abuse of that discretion. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding prin-

ciples. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 448 (Tex.App.-Houston [14th Dist.] 2002, no pet.). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

■ Texas Rule of Evidence 702, entitled "Testimony by Experts," provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Expert testimony is admissible if the expert is qualified and the testimony is relevant and based on a reliable foundation. *Helena Chem. Co.*, 47 S.W.3d at 499. Once the party opposing the expert testimony objects, the proponent bears the burden of demonstrating the admissibility of the testimony. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995).

Champion argues that the trial court excluded the expert's testimony for the improper reason that Dr. Johnston could not offer an opinion as to whether the proposed safer alternative designs were technologically and economically feasible or could reduce or eliminate risk without substantially impairing the product's utility, as contemplated by section 82.005(b). According to Champion, an expert was not required to provide testimony on those elements because he offered this proof through his own testimony and through Great Dane's representatives. To the extent that we have determined above that Champion did not present this evidence

covered. This testimony was in reference to the steel grate like the one he saw in the 1970s. As discussed above, Champion did

not produce evidence to establish that this alternative design met the requirements of section 82.005.

under section 82.005(b) through testimony from Champion or Great Dane's representatives, the requirements of design defect generally necessitate competent expert testimony and objective proof that a defect caused the injury. *See Nissan Motor Co.,* 145 S.W.3d at 137; *DeGrate,* 261 S.W.3d at 410–11. We, therefore, consider whether Dr. Johnston was qualified to offer an opinion as to defective design.

The party calling the witness must show the expert is qualified by having "knowledge, skill, experience, training, or education" to testify on the specific issue before the court. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998). Rule 702 permits expert testimony if such testimony would assist the trier of fact in understanding the evidence or determining a fact issue. Tex. R. Evid. 702; *see Gammill,* 972 S.W.2d at 718. Whether an expert is qualified under Rule 702 is a preliminary matter to be determined by the trial court. *See Gammill,* 972 S.W.2d at 718. A trial court "must ensure that those who purport to be experts truly have expertise concerning the actual subject matter about which they are offering an opinion." *Id.* at 719 (quoting *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996)). "General experience in a specialized field is insufficient to qualify a witness as an expert." *General Motors Corp. v. Burry,* 203 S.W.3d 514, 526 (Tex. App.-Fort Worth 2006, pet. abated). If the expert is not qualified to offer a particular opinion in a particular case, then the expert's testimony is not admissible because it does not rise above mere speculation, and, accordingly, does not offer genuine assistance to the jury. *Broders v. Heise,* 924 S.W.2d 148, 150–54 (Tex.1996).

Champion asserts that the trial court incorrectly framed the issue in evaluating Dr. Johnston's qualifications by requiring Dr. Johnston to be an expert in all aspects of refrigerated trailer design. Champion argues that the focus of this case was about a particular design feature, the uncovered gutter of the trailer, and that Dr. Johnston was well-qualified to discuss potential hazards associated with truck drivers crossing the uncovered gutter in the course of a job duty. The record reflects that the trial court engaged in a lengthy discussion with the parties outside of the jury's presence about the admissibility of Dr. Johnston's testimony for design defect. In this exchange, the trial court characterized this case as involving "a refrigerated trailer with a specialized flooring system and specialized drainage needs." On this basis, the trial court did not require Dr. Johnston to be an expert in all aspects of refrigerated trailer design.

Dr. Johnston holds advanced degrees in industrial engineering and an undergraduate degree in mechanical engineering. He is an expert in product safety engineering and human factors engineering. Over the course of a twenty-four year career as the head of the Safety Engineering Program at Texas A & M University, Dr. Johnston taught more than one thousand graduate and undergraduate students in the fields of industrial safety engineering, product safety engineering, and human factors engineering. In that capacity, he taught those students how to properly and safely design all types of products for the workplace.

Dr. Johnston equated the hazard posed in this case—i.e., pallet-jack wheels falling into the uncovered rear gutter—with similar hazards he had examined, including a gutter or crack in a sidewalk or walking surface in which a child's roller blade or wheel could become lodged, or a wheel chair ramp. Dr. Johnston characterized the hazard in this case as "nothing more than a gap in a walking surface, a surface that truck drivers have to walk across and also have to run dollies and so forth." His

solution was to cover or fill the gutter. Dr. Johnston acknowledged that he had not designed and did not intend to design a safer alternative. Champion sought to use Dr. Johnston's testimony to establish that the alternative designs, as previously described at trial by Hofstetter and Champion, met the requirements of section 82.002(b) in substantially reducing or eliminating the risk of injury.

■ As with one of the experts in the products-liability case *Gammill v. Jack Williams Chevrolet, Inc.*, Dr. Johnston in this case is not qualified to offer testimony as to any alleged design defect with the trailer's uncovered rear gutter.[14] *See* 972 S.W.2d at 719. "Just as not every physician is qualified to testify as an expert in every medical malpractice case, not every mechanical engineer is qualified to testify as an expert in every products liability case." *Id.* Dr. Johnston may have demonstrated his experience in designing workplace products and in designing solutions for hazards in walking surfaces, but he was not shown to have any training, experience, or special knowledge in the design or manufacture of refrigerated trailers or their relevant components, i.e., the rear uncovered gutter of refrigerated trailers that served a particular purpose for the trailer's drainage. *See id.* at 718.

Although Dr. Johnston held the same undergraduate degree in mechanical engineering as some of Great Dane's engineers, this degree did not demonstrate that Dr. Johnston possessed specialized knowledge about the refrigerated trailer's uncovered gutter and drainage system. *See id.* (requiring an expert to possess special knowledge on the very matter for which the opinion is offered). Dr. Johnston's deposition revealed that he had participated in cases with accidents involving pallet jacks and loading or unloading cargo in trailers. However, he had no experience or specialized knowledge involving uncovered gutters or alternative designs for the gutters in refrigerated trailers. On this record, Dr. Johnston was not shown to have any expertise that would qualify him to testify about any alleged design defects in a refrigerated trailer's uncovered gutter or the proposed alternative designs. *See id.*

Dr. Johnston demonstrated no specialized knowledge regarding the particular design of this uncovered gutter, and, accordingly, his testimony as to Champion's proposed alternative designs did not rise above mere speculation. *See Broders*, 924 S.W.2d at 150–54. For this reason, Dr. Johnston was not qualified to offer an opinion as to any alleged design defect of the gutter at issue. *See* TEX. R. EVID. 702; *Gammill*, 972 S.W.2d at 719. Therefore, the trial court did not abuse its discretion in excluding Dr. Johnston's testimony as to design defect. *See Gammill*, 972 S.W.2d at 719. Because we conclude Dr. Johnston was not qualified under Rule 702, we do not address the merits of whether the trial court assessed the expert's reliability un-

---

**14.** In contrast, a second expert witness in *Gammill* was shown to be qualified to testify about defects concerning a rear seat belt of the automobile at issue. *See Gammill*, 972 S.W.2d at 719. Although this second expert in *Gammill*, a licensed engineer, had a long academic career, similar to Dr. Johnston in this case, this second expert researched vehicle restraint systems, including systems like the one at issue, and had published articles on the subject. *See id.* This expert testified in numerous cases involving allegations of seat belt defects. *See id.* We factually distinguish Dr. Johnston from this expert in *Gammill* because, as shown in his deposition testimony, Dr. Johnston had not conducted research on uncovered gutters in refrigerated trailers, nor had he published articles on the subject or testified in any cases involving this type of allegation. *See id.*

der an improper standard. Accordingly, we overrule Champion's second issue.

Having overruled Champion's two issues on appeal, we affirm the trial court's judgment.