**Affirm and Opinion Filed July 23, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-01057-CV

**LAWRENCE BAILEY, Appellant**

**V.**

**RESPIRONICS, INC. AND RESPIRONICS COLORADO, INC., Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 07-00960**

## MEMORANDUM OPINION

Before Justices Moseley, Bridges, and Lang
Opinion by Justice Bridges

Lawrence Bailey, individually and as representative of the estate of Paula S. Bailey, deceased, Melissa Bailey and Byron Bailey (Bailey) appeal the trial court's summary judgment in favor of Respironics, Inc. and Respironics Colorado, Inc. In four points of error, Bailey argues the trial court erred in (1) refusing to continue Respironics' motion for summary judgment, (2) striking Bailey's medical device expert Edward Reese, (3) refusing to hear or grant Bailey's motion for leave to file the summary judgment affidavit of John Hughes, and (4) granting summary judgment in favor of Respironics. We affirm the trial court's order granting summary judgment.

The facts as set forth in Bailey's pleadings show that, before November 20, 2004, Paula Bailey had contracted Lou Gehrig's disease and was mostly paralyzed and needed a respirator to

breathe. Bailey purchased a home respirator and hired Epic Medstaff Services Dallas and Epic Medstaff Home Healthcare Dallas to provide home nursing care for Paula. Nurse Terri Crowder, an Epic employee, cared for Paula on the night shift of November 19, 2004. Allegedly due to Crowder's incorrect adjustment of a valve on the respirator, Paula died.

On February 2, 2007, Bailey filed his original petition asserting negligence claims against Epic. The case progressed, and Bailey filed his third amended petition joining Respironics on August 19, 2009. In addition to the facts already alleged, Bailey asserted Paula's ventilator was designed, manufactured, marketed, and sold by Respironics. Bailey alleged the ventilator was negligently and defectively designed and manufactured to permit a ventilator-dependent patient to suffer respiratory arrest without an alarm sounding. In addition, Bailey alleged Respironics negligently marketed the ventilator without warnings or adequate warnings that a user of the ventilator with the alarms properly set could suffer respiratory arrest without an alarm sounding. Bailey also asserted product liability claims for defective design, manufacture, and marketing of the ventilator.

On October 2, 2009, Respironics filed its original answer asserting Bailey's injuries and damages were the result of causes unrelated to any conduct of Respironics or any of its products. Further, Respironics asserted its product was sold to sophisticated and learned persons or entities who knew or should have known of any potential hazards from the use of Respironics' product.

On November 12, 2009, the trial judge signed an agreed protective order directing that the ventilator, its component parts, and tubing be preserved at a climate controlled facility maintained by Bailey.

On July 8, 2010, Bailey sent his first request for production to Respironics. On July 30, 2010, the parties entered into a Rule 11 agreement extending both Bailey's and Respironics' deadline to designate experts until thirty days after the testing of the ventilator. On August 6,

2010, Respironics filed its objections and responses to Bailey's first request for production. Respironics raised various objections but repeatedly stated it would disclose relevant, responsive and non-privileged documents subject to entry of a confidentiality order.

On November 12, 2010, Respironics sent a letter to Bailey objecting to the testing of the ventilator because it had not been maintained on an annual basis and there was therefore a "high likelihood that in the six years since the event took place, many of the seals and other parts that should be maintained on an annual basis may not operate correctly." Respironics stated any tests performed on the ventilator might result in a false positive or a false-negative test result.

On November 29, 2010, the trial court entered a new agreed scheduling order setting a February 12, 2011 deadline for Bailey to designate experts.

On April 7, 2011, Respironics filed a traditional and no-evidence motion for summary judgment asserting the evidence conclusively established that the ventilator operated properly at the time of Paula's death. Further, the motion asserted Bailey did not produce any evidence that the ventilator did not sound an alarm to signal Paula's respiratory distress. In support of the motion, Respironics attached the deposition of Merv Cross, a registered respiratory therapist with a degree in inhalation therapy. Cross testified he met with Paula's caregiver Barbara Virtue in late October 2004. Prior to going to a home inspection of Paula's residence, Cross understood that Paula's physician had prescribed a Respironics PLV-100 ventilator for her. When Cross was first contacted by Paula's hospital, Cross made sure the PLV-100 was within certification and bench tested the ventilator in accordance with the Respironics therapist manual. Part of the test included testing the alarms on the ventilator. The ventilator operated properly at that time, including the alarms.

Cross's understanding was that Bailey was going to retain a nursing service, and Cross offered to "do classes for the nurses." On the day Paula was discharged from the hospital, Cross

told the nursing service supervisor, at a meeting where Virtue was present, that he would come to their office to train their nurses. The supervisor said all of the nurses were certified and trained to use the PLV-100, and no training was necessary. Cross asked if the supervisor was sure she did not want Cross to come by "at least one shift to check in with them," and the supervisor told Cross, "No, we don't need you." As a result, Virtue was the only person Cross trained on the ventilator.

Cross testified he delivered the ventilator to the hospital, the hospital staff set it up, and the "doctors tell them what to adjust the dials to." The "physician only" prescribes the ventilator settings and orders them. To Cross's knowledge, no one was authorized to change the settings without a physician's order.

Paula was placed on the ventilator while in the hospital, and Cross went to see her before she was discharged. Cross checked with the respiratory staff to see if the ventilator was doing what it was supposed to do. The hospital staff said the machine was doing the job. Installed on the ventilator was a PEEP (positive end-expiratory pressure) valve that held a small pressure in the lungs to maintain an "open balloon," thus preventing the lungs from collapsing. The purpose of the valve is to extend the time that oxygen can go into the bloodstream from the lungs and that carbon dioxide can come out. The valve was "strictly used as per doctor's prescription. Cross instructed Virtue not to change any settings on the ventilator including the PEEP settings without a physician's instruction.

On November 15, 2004, the day Paula came home from the hospital, Cross followed her home "to witness that she was made comfortable and that everything was put where [he] recommended be put at the time for delivery at the house." Cross checked all of the electrical outlets in the "rather large area" of the house where Paula might go and made sure it was "easy to move the bed through the door." The therapist at the hospital had put the ventilator on Paula

already, and Cross did not notice anything "that was of concern or wrong with that ventilator." From November 15 until November 20, the day Paula died, Cross went by every day to check on Paula. Each day, Cross ensured that the ventilator settings were set in accordance with the physician's orders and that it was operating properly. Cross never saw anyone but Virtue operating ventilator and caring for Paula.

On November 20, Cross received a call that Paula had died, and he went to the Bailey home, arriving around 11 a.m. or noon. Cross talked to Virtue about what happened. Virtue said Paula was dead when Virtue arrived. Cross was concerned what had happened, and he tested the ventilator. The ventilator "alarmed" and "did all the things it was supposed to." Cross "put [his] tubing on there" then "put their tubing back on and turned it on." Cross did not touch the dials except to turn the machine on and off and only put his tubing on and off. Cross "hooked up the test lung to it to where the patient would've been, to simulate because otherwise it would just sit there and buzzed-alarm." The ventilator had "all of the same levels on it that it had when it was set up." Cross only tested the alarms and did not measure exhale volumes because they were irrelevant to him. The ventilator alarm "functioned fine and it alarmed fine."

Cross asked Virtue what had happened, and Virtue said "the tube on the exhalation manifold was off." The exhalation valve line is "a little bladder" that "allows pressure to go into the patient and then when the machine reaches a pressure, it cycles off, the pressure is released, and that's where the exhalation comes out." Cross observed that the exhalation valve line was disconnected from the exhalation valve. Cross also noticed that the PEEP valve "looked strange" in that the prescribed setting was "a very little twist on the device," and "this one was cranked down excessively." Cross testified that, if the PEEP valve was closed or nearly closed, it would increase the pressure in the lung around the heart. Cross testified that, in his opinion, if

the exhalation valve line became disconnected and an alarm sounded, the alarm could be turned off by screwing down the PEEP valve.

Cross testified the Bailey family asked him not to reconnect the exhalation valve line and not to change any of the dials. Cross was allowed to turn the machine on and off and record what he found, and he was allowed to hook up his tubing. Based on Cross's training, education, and experience, he believed there was nothing wrong with the ventilator "as far as alarm goes." At his deposition six years later, Cross testified, "I couldn't tell you if you hook that machine up right now, push the button that it's going to work. It's been sitting on a shelf for six years. I'm not even going to attempt to do that." Cross stated the respirator showed it had preventive maintenance in October 2004 and was supposed to go back in October 2005.

In support of the motion for summary judgment, Respironics also attached the deposition of Terri Crowder, who testified she had been a licensed vocational nurse since 1986. Crowder testified Paula may have been her first home care patient while working for Epic, and Crowder had not used the PLV-100 ventilator before treating Paula. On November 19, 2004, Crowder started her shift at the Bailey residence at 10:00 p.m. When Crowder arrived, she found "almost no paperwork" and none of the forms, records and physician's orders she expected. Crowder remembered specifically the family was giving Paula her medications because there was no Medical Administration Record to show when medications had been given or when they needed to be given in the future. Crowder "ended up kind of being stuck winging it on that."

Virtue was at the Bailey home when Crowder arrived, and the two talked about "general background and orientation to the situation." Crowder did not recall talking with Virtue about the ventilator settings because Virtue is "an unlicensed caregiver that's not a nurse." Crowder called Epic at the beginning of her shift, but she did not remember who she talked to or what was discussed. However, Crowder was "quite certain" the missing Medical Administration Record

and physician's orders would have been a topic of conversation. In her clinical notes taken at 11:00 p.m., Crowder wrote "Alarms on," which meant she checked to be sure that all of the switches that could have turned an alarm off were not turned off. At 1:30 a.m., Crowder's notes indicated Paula received half a tablet of hydrocodone, but Crowder testified she could not have been the one to administer the medication because she had no Medical Administrative Record or physician's orders allowing her to give Paula medication. Crowder could not remember, but she assumed a family member gave Paula the medication. At 2:00 a.m., Crowder reported Paula was "resting quietly." At 4:00 a.m., Crowder's notes indicated Paula received "Lorazepam, 1 milligram per peg with 250 cc flush given," but again Crowder assumed a family member had given the medication. At 6:00 a.m., Crowder noted she turned Paula to her right side and positioned her for comfort. At 8:00 a.m., Crowder again repositioned Paula and noted Crowder was holding medication pending primary caregiver's return at 9:00 a.m. Crowder also noted "all lines patent," indicating all lines were "hooked up like it's supposed to be," and "no change in vent sets," indicating there were no changes in the ventilator settings.

At 8:20 a.m., Crowder noted "area tidied up," which meant Crowder had cleaned all the equipment and straightened up the area around Paula. Crowder testified she was "right there" with Paula from 8:00 a.m. until Virtue arrived. Crowder "might have been behind the [kitchen] counter," but she could see Paula from the kitchen less than twenty feet away. When Virtue arrived at approximately 8:40 a.m., she "said something about she doesn't look right," and that prompted Crowder to check on Paula. Crowder denied that she was reading the newspaper when Virtue arrived. Paula was pale and nonresponsive with her eyes open, and Crowder began CPR. Crowder could not "swear that [she] really did hear an alarm" before beginning CPR, but she "would have expected it at that point." Crowder testified "if [the alarm] went off, I don't remember it going off because it would have been at a time when I expected it to." Regarding

–7–

the PEEP valve, Crowder testified she did not recall having to adjust the PEEP valve. When Crowder was putting Paula on her back to perform CPR, Crowder knew "some line popped loose," but she was not worried about it because she was taking Paula off the ventilator anyway.

Virtue testified she cared for Paula for "three or four" years as a "caregiver." Virtue arrived on the morning of November 20 and found Crowder "sitting at the kitchen table reading the paper." Virtue immediately checked on Paula and said "she doesn't look right." Paula was cold and had a blank stare. She was "just real white," and her lips were gray. Virtue looked down at the ventilator, which was not alarming, and saw "the cord [was] off and her PEEP [was] off." Virtue disconnected Paula from the ventilator and began emergency CPR, but Paula was already dead. Virtue noticed one of the tubes on the ventilator was disconnected and the PEEP valve was "the way it wasn't supposed to be." The PEEP valve looked "turned all the way down" to Virtue. There was "no doubt in [Virtue's] mind" that the PEEP valve had been changed and turned down from its setting of the night before.

On May 9, 2011, Bailey filed a motion for continuance requesting that the May 12, 2011 summary judgment hearing be reset. Bailey argued Respironics failed to produce "many relevant and responsive documents" which would show the defective nature of the ventilator. Bailey admitted delaying taking depositions of Respironics employees and a corporate representative pending full production by Respironics of responsive documents. Bailey also admitted delaying testing of the ventilator until receiving full document production from Respironics. On May 10, 2011, Bailey filed a motion to modify scheduling order and supplement to his motion for continuance in which he reiterated Respironics had not timely and fully responded to Bailey's requests for production of documents. The motion laid out the procedural history of the case and stressed Bailey's need for complete discovery to allow him to prepare adequately for trial and respond to Respironics' motion for summary judgment. The

motion requested "a reset of the case to late 2011 or early 2012 in light of the time expected to do the needed discovery."

The hearing on Respironics' motion for summary judgment was rescheduled until May 13, 2011. At the hearing, the trial judge stated he was "not inclined to continue the trial," noting this was a "2007 case "and "the oldest case on [the court's] docket on the date that it's set for trial." Bailey's counsel urged the need for a continuance, and the trial judge responded that the case was "just so old" that it was "outside the Texas Supreme Court guidelines with regards to timeframes to try and matter like this." The trial judge asked Bailey's counsel about documents he requested from Respironics that were due in August 2010 and the confidentiality agreement Respironics wanted before producing the documents. The trial judge asked, "and between August and February 21st, I think it is, there was no movement in regards to that." The trial judge asked counsel for Respironics to describe how Respironics responded to the request for production. Respironics' counsel stated Respironics offered to give Bailey a confidentiality order but "never heard back from him until February, and then he missed his designation deadline, didn't have an expert." The trial judge asked Bailey's counsel what he was doing between August and February to get the documents from Respironics. Bailey's counsel described the Rule 11 agreement providing that Bailey did not need to designate his experts until the ventilator was tested and discussed taking depositions "up through the end of October." Bailey's counsel described his position was that the next thing that needed to happen was testing the ventilator, but two things needed to happen before that took place: the depositions needed to be finished and Respironics needed to produce its documents. However, between the end of October when Cross' deposition was taken and February, Bailey's counsel didn't "have much to say about [his] sitting between the end of October and February."

–9–

Respironics' counsel reiterated her position that Respironics provided discovery responses, including a single adverse incident report, that were relevant to the particular facts of this case: a disconnected exhalation valve tubing and an incorrectly adjusted PEEP valve allegedly resulting in a failure to alarm. Bailey's counsel stated he was able to get adverse event reports from the FDA's website, and he complained the availability of these undisclosed reports from the FDA showed Respironics was withholding information. Bailey's counsel argued he had not gotten "whatever complaints [Respironics] have in their files that they didn't submit to the FDA, if there are any." Respironics' counsel responded that the FDA reports were public records and were not relevant to the particular facts of this case. The trial judge stated on the record that he was trying to determine if there was anything that would substantiate Bailey's request for continuance on the basis that Respironics was not as "forthcoming with evidence as they should have been." The trial judge stated that what he heard "[did] not persuade me in that direction" because Respironics objected to the requests for production and produced what they thought was appropriate. At that point, the trial judge continued, it was Respironics' burden to bring the matter to the trial court "to test the circle that they drew of what was discoverable." The trial judge stated, "that's the part that's missing here."

At the hearing, the trial judge also addressed Respironics' motion to strike the expert testimony of Dr. Reese, whose affidavit was served on Respironics thirty days before trial. Respironics' counsel argued Bailey failed to properly and timely designate Reese. Thus, counsel argued, Reese's affidavit had to be excluded unless Bailey showed good cause for failing to produce his report and lack of surprise and prejudice. Counsel complained Bailey failed to provide Reese's opinions in response to "several letters" from Respironics, yet Reese produced a forty-six-page affidavit thirty days before trial. Further, the affidavit was based on the documents Respironics produced even though Bailey had argued he could not produce expert

–10–

opinions based on the documents. Because Respironics had had no time to depose Reese or designate rebuttal experts, counsel argued the trial court should exclude Reese's affidavit.

At the conclusion of the hearing, the trial judge stated Bailey did not demonstrate good cause and there was "really no question" Respironics was surprised and prejudiced by the disclosure of opinions, over forty-six pages, by Reese after Respironics' designation deadline, after Bailey's designation deadline, and "when they have not been able to procure a rebuttal expert." The trial judge concluded the trial would not be reset and Reese would not testify at trial. Following the hearing, the judge entered summary judgment in favor of Respironics, and this appeal followed.

In his first point of error, Bailey argues the summary judgment motion should have been continued because Respironics delayed in producing relevant documents, preventing Bailey from preparing for the hearing on the motion for summary judgment.

When reviewing a trial court's order denying a motion for continuance, we consider whether the trial court committed a clear abuse of discretion on a case-by-case basis. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Id.* We have considered the following nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: the length of time the cases has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *Id.*

Here, this case began in February 2007, Respironics was added in August 2009, and the hearing was held on May 13, 2011. The trial judge stated this case was the oldest case on the trial court's docket. As Respironics pointed out, this case involves a particular set of

circumstances involving a disconnected exhalation tubing and an incorrectly adjusted PEEP valve. The documents Respironics produced enabled Reese to generate a forty-six page affidavit. Once Respironics produced certain documents and entered objections to the production of other documents in August 2010, Bailey took no action to secure the production of the withheld documents until late February 2011. Based on these facts, we conclude the trial judge did not abuse its discretion in denying a continuance. *See id.* We overrule Bailey's first point of error.

In his second point of error, Bailey argues the trial court erred in striking Reese's affidavit. Specifically, Bailey argues "the formation of [Reese's] opinions was justifiably delayed under a Rule 11 agreement postponing the designation of experts until after the ventilator had been tested and Respironics became opposed to the testing of the ventilator." The record shows that, on July 30, 2010, the parties entered into a Rule 11 agreement extending both Bailey's and Respironics' deadline to designate experts until thirty days after the testing of the ventilator. However, following Cross' deposition, on November 12, 2010, Respironics sent a letter to Bailey objecting to the testing of the ventilator because it had not been maintained on an annual basis and there was therefore a "high likelihood that in the six years since the event took place, many of the seals and other parts that should be maintained on an annual basis may not operate correctly." Respironics stated any tests performed on the ventilator might result in a false positive or a false-negative test result. On November 29, 2010, the trial court entered a new agreed scheduling order setting a February 12, 2011 deadline for Bailey to designate experts. Because he designated Reese as an expert on February 14, 2011, Bailey missed the deadline for designating Reese as an expert.

Further, Bailey disclosed that Reese was "expected to testify generally about the ventilator and its role in the incident made the basis of this lawsuit." Bailey did not disclose, as

requested by Respironics and as required by rule 194.2(f), the subject matter on which Reese would testify; the general substance of Reese's mental impressions and opinions and a brief summary of the basis for them; and all documents, tangible things, reports, models or data compilations that had been provided to, reviewed by, or prepared by Reese in anticipation of his testimony. *See* TEX. R. CIV. P. 194.2(f). The purpose of rule 194.2 (f) is to give the opposing party sufficient information about the expert's opinions to prepare to cross examine the expert and to prepare expert rebuttal evidence. *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 348 (Tex. App.–Fort Worth 2003, pet. denied). Bailey's vague disclosure of the substance of Reese's testimony did not comply with the requisites of rule 194.2(f). *See Bexar Cnty. Appraisal Dist. V. Abdo*, 399 S.W.3d 248, 256-57 (Tex. App.–San Antonio 2012, no pet.) (trial court did not err in excluding expert when "disclosure" regarding expert only vaguely stated expert may testify "about what is and what is not usable land and/or what is or is not in the floodplain . . . and/or matters associated therewith"). A party who fails to respond to or supplement his response to a discovery request shall not be entitled to offer testimony of a witness having knowledge of a discoverable matter unless the trial court finds good cause sufficient to require admission or determines the other party will not be unfairly surprised or prejudiced. TEX. R. CIV. P. 193.6 (a). We review a trial court's discovery rulings under an abuse of discretion standard. *Dolenz v. The State Bar of Tex.*, 72 S.W.3d 385, 387 (Tex. App.–Dallas 2001, no pet.). Because Bailey missed the deadline for designating Reese as an expert and failed to meet the requirements of rule 194.2(f), we conclude the trial court did not abuse its discretion in excluding Reese's affidavit. *See* TEX. R. CIV. P. 193.6(a); 194.2(f). We overrule Bailey's second point of error.

In Bailey's third point of error, he argues the trial court erred in failing to grant leave to file the affidavit of medical expert John Hughes. On May 12, 2011, the day before the hearing

on Respironics' motion for summary judgment, Bailey filed his motion for leave to file Hughes' affidavit. The record reflects a hearing on the motion for leave was set for May 26. At the hearing on May 13, Bailey did not address the motion for leave, argue the contents of Hughes' affidavit, or object to the May 26 setting for a hearing on the motion for leave. Following the entry of summary judgment, the May 26 hearing was canceled. To preserve a complaint for appellate review, a party generally must present it to the trial court by timely request, motion, or objection, stating the specific grounds, and obtain a ruling. TEX R. APP. P. 33.1(a); *Bryant v. Jeter*, 341 S.W.3d 447, 449-50 (Tex. App.–Dallas 2011, no pet.). By failing to raise the pending motion for leave at the hearing on Respironics' motion for summary judgment, we conclude Bailey's complaint on appeal was not preserved for appellate review. *Bryant*, 341 S.W.3d at 450. We overrule Bailey's third point of error.

In his fourth point of error, Bailey argues the trial court erred in granting summary judgment in favor of Respironics. Specifically, Bailey argues the testimony of Virtue and Crowder that the alarm on the ventilator failed to sound raised a fact issue, presumably as to the ventilator's defective condition.

A party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). Assuming such a motion otherwise complies with the rule, it must be granted unless the non-movant produces summary judgment evidence raising a genuine issue of material fact as to the contested element or elements. *Id.*; *see W. Invs. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). A party may also move for summary judgment on traditional grounds, i.e. there is no genuine issue as to a specified material fact and, therefore, the moving party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). For a defendant prevail in a traditional motion for summary judgment, it must either disprove at least

one element of the plaintiff's claim as a matter of law or conclusively establish all elements of an affirmative defense to that claim. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996). If the movant meets its burden, then and only then must the non-movant respond and present evidence raising an issue as to the material fact(s) in question. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999); TEX. R. CIV. P. 166a(c).

We review de novo a summary judgment granted on either no-evidence or traditional grounds, examining the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (per curiam). We cannot affirm a summary judgment on grounds other than those specified in the motion. TEX. R. CIV. P. 166a(c); 166a(i). However, if the trial court's order does not specify the grounds on which it granted summary judgment, we affirm if any of the grounds specified in the motion are meritorious. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). When the motion for summary judgment presents both no-evidence and traditional grounds, we first review the propriety of the summary judgment under the rule 166a(i) no-evidence standards. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

We affirm a no-evidence summary judgment if, as to an essential element of the claim or defense identified in the motion: (a) there is a complete absence of evidence; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered; (c) the evidence offered is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Thus, to avoid a no-evidence summary judgment, the non-moving party must bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to the element or elements attacked. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that

would enable reasonable and fair-minded people to differ in their conclusions. *Id.* On the other hand, the evidence amounts to no more than a scintilla if it is so weak as to do no more than create a mere surmise or suspicion of a fact. *Id.*

We affirm a traditional summary judgment if the evidence submitted in support of the motion and any response shows that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c).

In addition to products liability claims, Bailey alleged Respironics was negligent in its design, manufacturing, and marketing of the ventilator. Normally, strict products liability and negligence are separate causes of action with different elements. *Shaun T. Mian Corp. v. Hewlett-Packard*, 237 S.W.3d 851, 857 (Tex. App.–Dallas 2007, pet. denied). However, here Bailey alleged no negligence other than conduct relating to whether the ventilator was unreasonably dangerous when sold. *See id.* As a result, Bailey's negligence theories are encompassed and subsumed in his defective product theories, and Bailey's burden at trial would be to prove injury resulting from a product defect. *Id.* Therefore, any error in disposing of Bailey's negligence claims cannot have caused the rendition of an improper judgment or prevented Bailey from properly presenting his case to this Court. *See* TEX. R. APP. P. 44.1(a); *Hewlett-Packard*, 237 S.W.3d at 857. Bailey's right to recover against Respironics stands or falls on the outcome of his products liability claims. *Hewlett-Packard*, 237 S.W.3d at 857. We thus affirm the trial court's judgment as to Bailey's negligence causes of action. *Id.*

Bailey also alleged all three products liability theories: defective design, defective manufacturing, and defective marketing. *See Id.* Products liability imposes strict liability on the manufacturer of an unreasonably dangerous product that is a producing cause of a plaintiff's injuries. *Id.* The plaintiff must prove the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Ridgway*, 135

S.W.3d at 600; *Hewlett-Packard*, 237 S.W.3d at 858. A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *Ridgway*, 135 S.W.3d at 600; *Hewlett-Packard*, 237 S.W.3d at 858. Generally, the requirements to prove a design defect in a products liability action necessitate competent expert testimony and objective proof that a defect caused the injury. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004); *Champion v. Great Dane Ltd. Partnership*, 286 S.W.3d 533, 538 (Tex. App.–Houston [14th Dist.] 2009, no pet.).

Here, Bailey failed to present expert testimony that the ventilator was defective when it left the hands of Respironics. *See Ridgway*, 135 S.W.3d at 600; *Hewlett-Packard*, 237 S.W.3d at 858. On the contrary, Cross testified extensively concerning his testing of the ventilator prior to its delivery to Paula, his confirmation the ventilator was working properly every day that Paula's house, and his testing of the alarms on the ventilator approximately three hours after Paula's death. Cross testified the alarms worked properly. Bailey argues the testimony of Virtue and Crowder created a fact issue because both Virtue and Crowder testified the alarms did not alert them prior to Paula's death. Crowder also testified she wrote in her clinical notes taken at 11:00 p.m., "Alarms on," which meant she checked to be sure that all of the switches that could have turned an alarm off were not turned off. Crowder's notes also indicated Paula received medications in the early morning hours, but Crowder testified she could not have been the one to administer the medication because she had no Medical Administrative Record or physician's orders allowing her to give Paula medication. Crowder could not remember, but she assumed a family member gave Paula the medication. Virtue testified the ventilator alarm did not alert her to Paula's distress, but the records shows that Paula was already dead when Virtue arrived at the Bailey house, and Crowder was reading the newspaper in the kitchen. Cross tested the alarm approximately three hours after Paula's death, and the alarm sounded.

–17–

The evidence showed the ventilator passed its initial testing and functioned properly in the hospital and for five days at Paula's home. Paula was totally dependent on the ventilator in order to breathe. Following Paula's death, the ventilator was found to have a disconnected exhalation tube, and the PEEP valve had been set incorrectly. Regardless of who incorrectly adjusted the PEEP valve or how the exhalation tubing became disconnected, none of this evidence established that the ventilator was defective when it left the hands of Respironics. Bailey argues the mere fact that the PEEP valve could be adjusted in such a way as to silence an alarm rendered it unreasonably dangerous. We disagree. Cross testified the ventilator settings were set by a physician's prescription. Following Paula's death, the PEEP valve was set contrary to the physicians prescribed setting. The fact that it may have been possible for Crowder or someone else to disregard the physician's prescription, disregard a sounding alarm, and tighten the PEEP valve to make the alarm stop was no evidence the ventilator was defective when it left the hands of Respironics. Under these circumstances, we conclude Respironics was entitled to summary judgment on Bailey's products liability claims. *See King Ranch*, 118 S.W.3d at 751; *Ridgway*, 135 S.W.3d at 600. We overrule Bailey's fourth point of error.

We affirm the trial court's judgment.

111057F.P05
/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

–18–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

LAWRENCE BAILEY, Appellant

No. 05-11-01057-CV       V.

RESPIRONICS, INC. AND RESPIRONICS
COLORADO, INC., Appellees

On Appeal from the 116th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 07-00960.
Opinion delivered by Justice Bridges.
Justices Moseley and Lang participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees RESPIRONICS, INC. AND RESPIRONICS COLORADO, INC. recover their costs of this appeal from appellant LAWRENCE BAILEY.

Judgment entered this 23nd day of July, 2014.