Stephens Collier SMITH and wife, Marlyce Smith, Individually and on behalf of their Minor Daughter, Melissa Smith, the Surviving Family Members of Stephanie Elizabeth Smith, Deceased and on Behalf of the Estate of Stephanie Elizabeth Smith, Deceased, Appellants,

v.

AQUA–FLO, INC., Appellee.

No. 01–00–00024–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 4, 2000.

Rehearing Overruled June 23, 2000.

William J. Tinning, Portland, for appellant.

Evelyn Ailts Derrington, Houston, for appellee.

Panel consists of Justices MIRABAL, TAFT, and PRICE.*

**OPINION**

TIM TAFT, Justice.

This is an appeal from a take-nothing jury verdict in a products-liability suit. Appellants, the surviving family members of Stephanie Elizabeth Smith (the Smiths), challenge the trial court's granting a directed verdict and the jury's verdict in favor of appellee, Aqua–Flo, Inc. (Aqua–

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at

Flo). We address (1) whether the trial court erred in granting a directed verdict on the Smiths' design defect cause of action; (2) whether the trial court improperly influenced the jury on the remaining issues by granting a directed verdict on the Smiths' design defect cause of action; (3) whether the verdict, finding Aqua–Flo without fault, was against the great weight and preponderance of the evidence; and (4) whether the trial court erred in granting a directed verdict on the Smiths' gross negligence claim. We affirm.

**Facts**

This case involves the water pump of a spa in which six-year-old Stephanie Smith drowned. Since 1971, Aqua–Flo has manufactured water pumps used in spas, water fountains, aquariums, amusement parks, wading pools, and York cooling towers. Aqua–Flo manufactured the pump at issue in 1980.

The Smiths were given a used spa by a friend, Stuart Cory, in 1993. The spa was in good working order when it was given to the Smiths. Mr. Smith placed the spa in a hole in his backyard and "put the equipment pack on and ran electricity to it." Mr. Smith checked all the suction covers and felt no strain or suction from any of the intake valves.

The Smiths' two daughters used the spa daily in the summer of 1994 as a "kiddy pool." On one fateful occasion, Mrs. Smith put the two children in the spa, turned on the bubbles, and went inside to prepare dinner. Four-year-old Melissa came inside saying Stephanie would "not come up." Stephanie's hair was entangled in one of the plastic intake covers. Mrs. Smith ran to the spa and used all her strength to pull Stephanie out. The drain cover remained tangled in Stephanie's hair after she was pulled free from the spa. This accident was fatal to Stephanie.

Houston, participating by assignment.

## Procedural History

The Smiths initially sued Cory, who had given them the spa. After 17 amended petitions, the Smiths added Century Electric Co., Inc., Jacuzzi, Inc., Jacuzzi Brothers Inc. d/b/a Jacuzzi, Inc., Jacuzzi Whirlpool Baths, Inc. d/b/a Jacuzzi Inc., LSP Products Group, Inc., formerly known as Aqua–Flo, Inc., Aqua–Flo Inc., NCH Corp., PPS Holdings, Inc., formerly known as Polaris Pool Systems, Inc., Alopex Industries, Inc., formerly known as Polaris Pool Systems, Inc., All American Tackle Manufacturing, Inc., formerly known as Polaris Pool Systems, Inc., Epicurean Products, Inc., formerly known as Polaris Pool Systems, Inc., Swimrite, Inc., formerly known as Polaris Pool Systems, Inc., and Polaris Pool Systems, Inc. The only party not joined was the drain-cover manufacturer, which was not identifiable due to a total lack of markings on the cover.

Aqua–Flo manufactured the pump used in the Smiths' spa. In their final amended petition, the Smiths claimed that Aqua–Flo was negligent and liable under strict tort liability for not installing an automatic shut-off device, not warning of high flow rates and suction associated with the use of its spa pump, and not warning about the need for safety type drain covers that could have prevented hair entrapment. The Smiths settled with all defendants except Aqua–Flo.

After all the evidence was submitted to a jury, the trial court directed a verdict against the Smiths' on their gross negligence claim and their strict tort liability design-defect claim. The trial court submitted to the jury the Smiths' remaining claims of negligence and strict tort liability for failure to warn. The jury returned a verdict in favor of Aqua–Flo. The Smiths timely perfected this appeal.

## Directed Verdict: Design Defect

In their first issue, the Smiths argue the trial court erred in granting a directed verdict on their design defect cause of action because they produced evidence supporting the claim. Aqua–Flo maintains the Smiths did not produce any evidence supporting their claim the pump was defectively designed.

### A. Standard of Review

A directed verdict is appropriate when reasonable minds can draw only one conclusion from the evidence. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978); *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). In evaluating a directed verdict, we determine if there was legally sufficient evidence that would support each of the elements of the cause of action. *M.J. Sheridan*, 731 S.W.2d at 623. If the Smiths introduced some evidence on each of the elements for design defect, the trial court erred in granting Aqua–Flo's motion for directed verdict. *Id.* at 624. In evaluating the evidence, we examine it in the light most favorable to the party against whom the verdict was rendered, and disregard all contrary evidence and inferences. *Qantel Bus. Sys., Inc. v. Custom Controls*, 761 S.W.2d 302, 303 (Tex.1988); *M.J. Sheridan*, 731 S.W.2d at 623.

### B. Strict Tort Liability

Texas has adopted the Restatement (Second) of Torts section 402A to define strict tort liability as:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

(a) the seller is engaged in the business of selling such product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 613 (Tex.1996) (quoting from Restatement (Second) of Torts § 402A (1965)). A product may be unreasonably dangerous due to a defect in its manufacture or design (design defect), or a failure to provide adequate warnings or instructions (marketing defect). *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995).

 To prove a design defect, the Smiths had to show that (1) there was a safer alternative; (2) the safer alternative would have prevented or significantly reduced the risk of injury, without substantially impairing the product's utility; and (3) the safer alternative was both technologically and economically feasible when the product left the control of the manufacturer. TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b) (Vernon 1997). The Smiths had the burden of proof to demonstrate a safer alternative design by a preponderance of the evidence. *Id.* If no evidence is offered that a safer design existed, the product is not unreasonably dangerous as a matter of law. *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 433 (Tex.1997); *Caterpillar, Inc.,* 911 S.W.2d at 384. To prove a safer alternative, the Smiths had to show that the alternative design would have substantially reduced the risk of injury and would have been both economically and technologically feasible. *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999).

The Smiths argue that they produced sufficient evidence on the issue of a safer alternative design to warrant submitting the issue to the jury. They argue that they produced evidence of a safer alternative design because the pump, which did not meet national standards, would nave been safer with a pressure sensitive shut-off device and a larger intake opening.

### 1. Pressure Sensitive Shut-off Switch

 The Smiths' evidence of a safer alternative design came from their expert, Dr. Adams, who testified that pressure sensitive shut-off technology was available prior to 1980 when the Aqua–Flo pump was made. Adams also testified that the absence of a pressure sensitive shut-off switch made the Aqua–Flo pump unreasonably dangerous and defectively designed.

Aqua–Flo points out that Adams' testimony was legally insufficient to demonstrate that the pump was defectively designed because no testimony suggests the economic feasibility of incorporating a pressure sensitive shut-off switch into the Aqua–Flo pump in 1980 or at any time. The Smiths had the burden to prove that an alternative design was economically feasible. *See Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 258 (Tex.1999). Absence of this testimony, without more, suffices to support the trial court's directed verdict. *Grinnell,* 951 S.W.2d at 433 (Tex.1997); *Robins v. Kroger,* 982 S.W.2d 156, 164 (Tex.App.—Houston [1st Dist] 1998, pet. denied).

 The Smiths maintain they produced evidence of economic feasibility because their expert testified that the technology of pressure sensitive shut-off switches was available in 1980, when the spa was manufactured. This evidence may address *technological* feasibility, but it does not address the element of *economic* feasibility. The existence of a technological advancement goes to technological feasibility, while the cost of applying that technology to a particular design goes to economic feasibility.

*Kindred v. Con/Chem, Inc.,* addresses feasibility. 650 S.W.2d 61 (Tex.1983). *Kindred* held that a party may demonstrate that a safer design was feasible "with evidence that it was in actual use or was available at the time of manufacture." *Id.* at 62. *Kindred* did not distinguish, however, between the two types of feasibility, technological and economic, that are required to maintain a design defect cause of action under current law. Moreover, under the law in effect in 1983, either technological or economic feasibility was a permissible way to establish a safer alter-

native design, although not the only way. *See id.* (citing *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980)). Consequently, *Kindred* did not require the plaintiff to prove both the scientific and economic feasibility of the proposed alternative design, as Texas Civil Practice and Remedies Code section 82.005 requires today. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005.

■ Technological feasibility and economic feasibility are two different concepts that require separate proof. For example, it may be technologically feasible to install air bags on bicycles; *i.e.,* scientists and engineers may have the ability to install air bags on bicycles. Having this technology does not mean that it is economically feasible, however, because installing air bags might cost hundreds or thousands of dollars per bicycle, thus rendering the cost of production unreasonable. In *Robins v. Kroger Co.,* the plaintiffs sued the store where they had bought a cigarette lighter, claiming that the lighter was defectively designed because it did not incorporate a child-restraint feature. 982 S.W.2d at 158. The plaintiffs established technological feasibility through expert testimony that the relevant technology was available when the lighter was manufactured. *Id.* at 164. Independent of this evidence, the plaintiffs also provided expert testimony of economic feasibility by showing that the cost of incorporating this technology would approach $50 million or roughly 1 to 5 cents per lighter manufactured. *Id.* Here, however, the Smiths offered no evidence of economic feasibility.

In addition to not providing any evidence of the economic feasibility of pressure sensitive shut-off switches, Adams did not state that pressure sensitive shut-off switches had been applied to spa pumps in 1980. He stated only that pressure sensor technology was generally available prior to 1980, and had been used in other plumbing applications, for example, commodes in airplanes. Moreover, Adams acknowledged that no company manufactured a pressure

switch for a spa until 1997, and that he had not investigated any other pump manufacturer in the United States to ascertain the state-of-the art or industry standards in 1980, when Aqua–Flo built and sold the pump.

Without any evidence of the economic feasibility of pressure sensitive shut-off switches in 1980, any research in the spa industry, or any evidence that anyone in 1980 was of the opinion that pressure sensitive shut-off switches should be applied to spa pumps, there was not even a scintilla of evidence that a reasonably safer alternative design existed for a shut-off switch when the pump was manufactured in 1980. *See Grinnell,* 951 S.W.2d at 433 (Tex.1997); *Robins,* 982 S.W.2d at 164.

### 2. Spa Pump Inlet

■ The Smiths also assert that the Aqua–Flo pump was defectively designed because of the size of the spa-pump inlet. Adams testified that the small size of "the discharge or the intake" increased the speed, but not the amount of water, that entered the pump. Adams used the analogy of placing a thumb over the opening of a garden hose as increasing the speed of the water without increasing the amount of water exiting a garden hose. Adams maintained that a larger opening in the "drain cover" and connecting pipes would have created a less dangerous flow rate. Aqua–Flo's expert agreed.

While the Smiths contend the spa's smaller pipes and inlet openings caused an unsafe flow rate that could have been easily ameliorated by increasing the pipe and inlet size, Adams' testimony does not distinguish between the need for larger inlet/outlet coverings on the Aqua–Flo pump versus on the spa. This distinction is important because, if the expert were testifying concerning the defective nature of the inlet/outlet coverings on the Aqua–Flo pump, the Smiths might have raised a fact issue concerning a design defect sufficient to preclude a directed verdict.

Counsel for the Smiths contends Adams testified concerning the inlet-outlet coverings on the pump, but the record does not corroborate these assertions. The only explicit statements Adams made concerning the inlet and outlet openings were to specify that he was discussing the inlet and outlet openings of the spa. He also testified that "the suction force is created within the spa as the result of the opening within the spa...." Therefore, according to the Smiths' own expert, the flow rate of the water returning to the pump is determined by the size of the opening in the spa's outlet opening, not the size of the pump's inlet/outlet openings.

The Smiths argue that the size of the pump inlet and outlet openings determines the size of the piping used, which in turn necessarily determines the size of the spa inlet and outlet openings. They defend this reasoning on the grounds that it is consistent with industry custom and usage. This argument has no support in the record. Nowhere does Adams, nor any of the Smiths' witnesses, demonstrate that spa-pump manufacturers dictate the size of pipes and spa inlet and outlet openings, or that this is consistent with industry custom or usage. Moreover, the evidence that addresses this issue leads to the opposite conclusion.

The trial court admitted into evidence the 1980 Minimum Standards for Residential Spas (Standards). The Standards are directed to spa manufacturers only, and not to pipe or pump manufacturers. Under the subsection "Inlets and Outlets," the Standards direct the spa manufacturer to use specific types and sizes of piping to ensure a proper flow rate in the pipe. For example, the Standards direct that "[s]pa piping shall be sized to permit the rated flows...." The Standards also require that the spa manufacturer incorporate additional safety precautions into the spa outlet openings to prevent bodily entrapment. The Standards direct the spa manufacturer to use certain pipes to regulate the flow rate within the pipes, and to use specified safety features within the spa, because the spa manufacturer is the only party in a position to determine what size and type of pipes to use and which safety features to combine with the spa outlet openings.

The Smiths' argument fails because their complaint lies with the plumbing and parts related to the spa and not the pump. Adams testified that the pump worked properly at all times, pumping water at a rate of 60 gallons per minute. The Aqua–Flo pump was installed by an unrelated third party, the spa manufacturer, who affixed the pump to connecting pipes and spa inlet and outlet openings. The Smiths' complaint is not that the spa pump created the unreasonably dangerous condition that led to Stephanie's death. Rather, they maintain that an unreasonably dangerous condition arose because the spa pump connected to small pipes that were connected to small inlet and outlet openings in the spa, without the proper anti-entanglement covers.

▪ A manufacturer of a component part who does not design or assemble the final product is not liable for defects in the final product if the component part is not defective. *Davis v. Dresser Indus., Inc.,* 800 S.W.2d 369, 370 (Tex.App.—Eastland 1990, writ denied); *Bennett v. Span Indus., Inc.,* 628 S.W.2d 470, 472–73 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.) ("We do not consider it proper to extend the doctrine of strict liability to the furnisher of components installed in a [product] according to the design of the owner or builder when the injuries are caused by the design of the [product] itself, rather than by defects in the components."). The United States Court of Appeals for the Fifth Circuit has interpreted Texas law to reach the same conclusion:

Under Texas law, strict liability for component part manufacturers is limited when the component part is integrated into a larger unit before distribution.... If the component part manufacturer does not take part in the design or

assembly of the final system or product, he is not liable for defects in the final product if the component part itself is not defective.

*Koonce v. Quaker Safety Prods. & Mfg. Co.,* 798 F.2d 700, 715 (5th Cir.1986). Courts in other jurisdictions agree:

[A] component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its nondefective component part.

*Childress v. Gresen Manufacturing Co.,* 888 F.2d 45 at 49 (6th Cir.1989) (interpreting Michigan law).

According to the Smiths' own expert, Aqua–Flo was simply the manufacturer of a component part that functioned properly. We agree with the Texas precedents and those jurisdictions that hold that a component-part manufacturer that does not design or assemble the final product is not liable for defects in the final product if the component part itself is not defective.

### 3. National Standards

The Smiths argued that the Aqua–Flo pump did not meet national standards under the 1980 Minimum Standards for Residential Spas and the 1978 Minimum Standards for Public Spas. Adams testified that the rate of water being pumped out of the Aqua–Flo pump was five times the allowable rate. The Smiths contend this is some evidence of a defect in design. Their expert, however, shifted the focus from the pump to the spa and its plumbing. The Standards, which Adams relied on, do not address the rate of water being pumped at the spa pump inlet or outlet openings. The national standards dictate only the maximum flow rate at the spa outlets or grate openings and within the pipes. This makes sense because the velocity of the water entering and leaving the spa is ultimately dictated, not by the pump, but by the size of the inlet and outlet coverings in the spa and the connecting pipes. Because the Standards Adams relied on do not define any flow rate for pumps, and address only the flow rate at spa inlet/outlet openings, the Smiths did not produce any evidence to demonstrate that Aqua–Flo pumps violated any national standards.

For the foregoing reasons, we conclude the trial court correctly directed a verdict on the issue of the Smiths' design-defect cause of action.

We overrule the Smiths' first issue.

### Directed Verdict: Tainted Jury

In their second and fourth issues, the Smiths argue that the directed verdict improperly influenced the jury in resolving the remaining issues of failure to warn and negligence, which entitles them to a new trial. The Smiths reason that, because the trial court removed the issue of design defect from the jury, the jury was led to believe the design of the Aqua–Flo pump was not defective, and that this misled and confused the jury on the issue of marketing defect or failure to warn.

The Smiths' argument assumes that a marketing-defect claim and a design-defect claim are so similar and inextricably intertwined that both must be submitted to the jury. The two claims are clearly distinct and separable. A marketing defect is found "if the lack of adequate warnings or instructions renders an otherwise adequate product unreasonably dangerous." *Caterpillar, Inc.,* 911 S.W.2d at 382. A design defect focuses on a defect in the product itself, and whether safer designs for the product were available. *Id.* at 384. The Smiths have not advanced any argument or authority to support their claim that a jury cannot understand the concept of a marketing defect unless a charge on design defect is also submitted.

Furthermore, nothing in the record suggests that the hearing on the directed verdict was conducted so as to influence the jury. Rather, the hearing took place out of the presence of the jury, whose members therefore heard none of the discussion between counsel and the trial court

on the merits of removing the issue of design defect from the jury's consideration. It cannot be argued that the trial court's decision to grant a directed verdict improperly influenced the jury without implicitly attacking the directed verdict itself. We have already overruled the Smiths' attack on this ruling. They cannot now defeat indirectly what they have not defeated directly.

We overrule the Smiths' second and fourth issues.

### Jury Verdict: Factual Sufficiency

In their third issue, the Smiths argue that the evidence supporting the jury's verdict, improperly influenced by the trial court's decision to grant a directed verdict on the design defect cause of action, was factually insufficient. The substance of this argument appears in the Smiths' brief under their fifth issue. In reviewing a factual sufficiency complaint, we apply the usual standard of review. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Merckling v. Curtis,* 911 S.W.2d 759, 763 (Tex.App.— Houston [1st Dist.] 1995, writ denied) ("Having considered and weighed all of the evidence, we should set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust.").

The Smiths argue that, because the directed verdict improperly allowed the jury to infer that Aqua–Flo was not at fault under any of the claims brought, the jury rejected any fault in Aqua–Flo for Stephanie's death. The Smiths reason that, if Aqua–Flo was not at fault, then nobody was at fault; and, if nobody was at fault, then this accident must have been "unavoidable"; and, if this tragedy was an "unavoidable accident," then it must have

been an act of God; and, because this tragedy was obviously not an act of God, the directed verdict necessarily and improperly misled the jury to find that Aqua–Flo was not at fault.

We are unpersuaded by this argument. The Smiths do not present a true factual sufficiency argument, but, rather, the same argument previously advanced and rejected on issues two and four as another indirect attack on the directed verdict. Furthermore, the jury did not reject fault in anyone; the jury found only that Aqua–Flo was not at fault. Moreover, having settled with numerous defendants, whom they necessarily believed to be at least partly responsible for their daughter's death, the Smiths negate their own contentions.

As discussed above, the directed verdict did not improperly influence the jury. The verdict is not so weak or against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Merckling,* 911 S.W.2d at 763.

We overrule the Smiths' third issue.

### Directed Verdict: Gross Negligence

■ In their fifth issue, the Smiths contend that the trial court erred in granting the directed verdict on their gross negligence claim.[1] The Smiths maintain that there was evidence of gross negligence that precluded the trial court from granting a directed verdict on that issue. The Smiths rely on the absence of any warning labels attached to Aqua–Flo pumps to prevent the type of accident that occurred in this case.

■ Gross negligence includes two elements:

---

1. The Smiths argue that the trial court erred in "granting a directed verdict on the punitive damages portion of the Plaintiffs' case against Aqua–Flo." The trial court did not grant a directed verdict on "punitive damages." The trial court granted a directed verdict on the

Smiths' gross negligence claim. Therefore, we interpret the Smiths' fifth issue as complaining of the trial court's granting a directed verdict on their "gross negligence" cause of action.

(1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). There is no evidence of either element here.

Aqua–Flo's omission of warning labels on its pump did not involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. The product was neither defectively designed nor defectively marketed. Aqua–Flo had manufactured and sold identical pumps since 1971 without a single complaint or injury. All Aqua–Flo pumps complied with United Laboratories and National Sanitation Foundation standards. A 1996 Consumer Products Safety Commission report released in 1996 disclosed three spa pump-related deaths prior to 1980. The Smiths did not produce any evidence demonstrating that this information was available in 1980, or any time before 1996.

As manufactured in 1980, the pump posed no objectively verifiable, extreme risk of harm. There was no evidence that Aqua–Flo had actual knowledge of any extreme degree of risk and still proceeded in conscious indifference to the rights of customers. Because there was no evidence presented to the jury regarding the Smiths' gross negligence cause of action, the trial court correctly directed a verdict regarding gross negligence.

We overrule the Smiths' fifth issue.

## Conclusion

We affirm the judgment of the trial court.