Affirmed and Opinion filed May 7, 2009








Affirmed and Opinion filed May 7, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00310-CV

____________

 

TOMMY CHAMPION, Appellant

 

V.

 

GREAT DANE LIMITED PARTNERSHIP, Appellee

 



 

On Appeal from the 189th
District Court

Harris County, Texas

Trial Court Cause No. 2005-52056

 



 

O P I N I O N

The
underlying products-liability case arose from injuries sustained by appellant,
a truck driver, in attempting to unload a truck trailer manufactured by
appellee.  The truck driver complains on appeal that the trial court erred in
excluding testimony from his expert witness as to the trailer=s alleged design defect and in
granting a motion for a directed verdict in favor of the manufacturer on the
design-defect claim.  We affirm.








I.  Factual and
Procedural Background

Appellant
Tommy Champion, a truck driver, filed suit against appellee Great Dane Limited
Partnership (hereinafter AGreat Dane@) for injuries he sustained in an incident involving a truck
trailer manufactured by Great Dane.  The trailer was owned by Penske Trucking
Leasing Company,[1] which leased
the trailer to Champion=s employer. 

Great
Dane designed and manufactured the refrigerated trailer according to Champion=s employer=s specifications.  The trailer had
ridged flooring that allowed cold air to circulate beneath the freight.  An
uncovered gutter[2] spanned the
width of the trailer in the rear, which allowed for condensation and liquids
from leaky freight to drain away from the freight.  Liquids flowed into
drainpipes on each side of the gutter to prevent pooling.  A Alift gate platform@ was attached to the rear of the
trailer, which facilitated loading and unloading cargo.  Champion had not used
this particular trailer before the incident in question.  








On the
day of the incident, Champion was transporting freight that did not require
refrigeration.  He was scheduled to deliver pallets of freight to several
locations.  He was supposed to use a pallet jack[3]
to pull the load off of the trailer.  At the first location, Champion
discovered the lift gate platform attached to the trailer was not level.  He
noted on a vehicle inspection form that Athis ramp needs to be fixed, drops
downhill.@  During the course of Champion=s trip, he unloaded about twelve to
fifteen pallets before arriving at his last stop.  He used a pallet jack to
unload these pallets and encountered no problems in crossing the trailer=s gutter, although he admitted the
pallets were relatively light.  He explained at trial that in unloading these
pallets, the wheels of the pallet jack Ahit@ the gutter and Abumped@ the gutter, so that the pallet jack Abounced across@ the gutter as he pulled cargo out of
the trailer.  

Champion=s last load was to be delivered to
Filter Fresh Coffee in San Antonio, where he was to unload four pallets. 
Although he unloaded the first two pallets without incident, he Ahit@ the gutter both times.  The third
and fourth pallets contained bottled water and cans of coffee, which were
wrapped in plastic Ashrinkwrap.@  These pallets were heavier and stacked higher than the
other pallets.  Champion slid the forks of the pallet jack under the third
pallet and used the pallet jack to lift the pallet off of the trailer=s floor.  The pallet became unstable
and almost fell as he maneuvered to the lift gate platform.  Champion
attributed the unstable load to the wheels of the pallet jack, which he claims
became lodged in the trailer=s gutter.  Filter Fresh Coffee employees assisted Champion by
removing some of the bottled water from the pallet.  He then moved the pallet
into the Filter Fresh Coffee building.

In
unloading the last pallet, Champion lifted and moved the pallet and approached
the lift gate platform from within the trailer.  The wheels of the pallet jack
fell into the gutter at the rear of the trailer.  The palletized load shifted,
and Champion stabilized it with his hands.  Champion Awiggled@ the load and then used the pallet
jack hydraulics to lower the load.  He pulled back so that the pallet jack
wheels were clear of the gutter and then lifted the load with the pallet jack. 
Champion maneuvered onto the lift gate platform, where the pallet jack rolled
6-7 inches on its own.  He then heard a Apop.@[4]  The lift gate platform dropped
several inches.  Champion lowered the load to prevent the pallet jack from
rolling off the end of the lift gate platform, and boxes fell from the pallet,
hitting him in the head and knocking out some of his teeth.  He jumped off of
the trailer and injured his heel, ankle, elbow and thumb.  Champion underwent
numerous surgeries for his injuries.  








Champion
brought suit against Great Dane, among others, alleging causes of action for
negligence, strict liability for a design defect and marketing defect, breach
of warranty, and gross negligence.  He complained that the trailer=s uncovered gutter subjected him to
an unreasonable risk of harm.  At trial, Champion sought to elicit testimony
from an expert witness regarding alleged marketing and design defects of the
trailer=s gutter.  The expert witness
testified briefly; however, the trial court excluded the expert=s testimony as to defective design
and permitted the expert to testify only for marketing defect.  

At the
close of Champion=s evidence,[5] by oral
motion, Great Dane moved for a directed verdict on Champion=s defective-design claim.  Great Dane
argued that Champion failed to produce evidence of a safer alternative design
for the trailer=s gutter and that had the safer alternative design existed,
Champion presented no evidence that it would have prevented the injuries he
sustained.  The trial court granted this motion. 

The
trial court submitted questions to the jury on Champion=s marketing-defect and negligence
claims.  The jury returned a verdict in favor of Great Dane, concluding that
Champion was 100% negligent and responding Ano@ to a question regarding marketing
defect.  The trial court entered a Atake nothing@ judgment in favor of Great Dane,
confirming the jury=s verdict.  Champion now appeals, asserting that the trial
court erred in excluding the expert=s testimony and in granting Great
Dane=s motion for directed verdict.

II. Issues and Analysis

A.      Did the trial court err in
granting a directed verdict for the manufacturer on the issue of design defect?

In his first issue, Champion argues that the trial court
erred in granting Great Dane=s oral motion for a directed verdict on
the issue of design defect.  








A trial court may instruct a verdict in favor of a
defendant if no evidence of probative force raises a fact issue on the material
questions in the suit.  See Prudential Ins. Co. of Am. v. Fin. Review
Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000).  A directed verdict in
favor of a defendant may be proper when (1) a plaintiff fails to present
evidence raising a fact issue essential to the plaintiff=s right of
recovery; or (2) the plaintiff admits or the evidence conclusively establishes
a defense to the plaintiff=s cause of action.  See id. 
We review the trial court=s granting of a directed verdict by
following the same standard for assessing legal sufficiency of the evidence.  See
City of Keller v. Wilson, 168 S.W.3d 802, 809B828 (Tex. 2005).  When reviewing the legal sufficiency
of the evidence, we consider the evidence in the light most favorable to the
nonmovant and indulge every reasonable inference that would support the
verdict.  Id. at 823.  When reviewing a directed verdict, we must credit
favorable evidence if a reasonable factfinder could and disregard contrary
evidence unless a reasonable factfinder could not.  See id. at 827. 

In his live petition, Champion alleged, among other things,
strict liability in design defect of the trailer=s Auncovered floor
gutter at the rear of the trailer that interfered with the transportation of
loads out of the trailer.@  A design defect renders a product
unreasonably dangerous as designed, thereby warranting strict liability, when
taking into consideration the utility of the product and the risk involved in
its use.  See General Motors Corp. v. Sanchez, 997 S.W.2d 584,
588 (Tex. 1999).








To establish a design defect, Champion had to show by a
preponderance of the evidence that (1) there was a safer alternative design;
and (2) the defect was the producing cause of the personal injury.  Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(a) (Vernon
2005).  A Asafer alternative design@ under section
82.005[6]
of the Texas Civil Practice and Remedies Code means that a product design other
than the one at issue would have prevented or significantly reduced the risk of
injury without substantially impairing the product=s utility and that
the safer alternative design was both technologically and economically feasible
when the product left the control of the manufacturer.  Id. ' 82.005(b); see
Sanchez, 997 S.W.2d at 588.  Generally, the requirements to prove a design
defect necessitate competent expert testimony and objective proof that a defect
caused the injury.  See Nissan Motor Co., Ltd. v. Armstrong, 145 S.W.3d
131, 137 (Tex. 2004) (concluding this premise was not peculiar to unintended acceleration
cases); DeGrate v. Executive Imprints, Inc., 261 S.W.3d 402, 410B11 (Tex. App.CTyler 2008, no
pet.) (providing that an expert=s conclusory statements as to design
defect are not competent evidence and are insufficient to defeat or support
summary judgment for design defect). 

Great Dane moved for a directed verdict, alleging that
Champion offered no evidence of a safer alternative design that was both
technologically and economically feasible when the trailer left Great Dane=s control in 1999.
Great Dane also alleged that Champion offered no evidence that a safer
alternative design, had it existed, would have prevented Champion=s injuries.  The
trial court granted Great Dane=s motion.








At trial, Champion sought to show that the trailer was
defectively designed because of the hazard created when the wheels of a pallet
jack became lodged in the trailer=s rear gutter in
the course of loading and unloading cargo.[7] 
On appeal, Champion maintains that he produced evidence of safer alternative
designs because James Hofstetter, Great Dane=s Vice President
of Product Safety and Compliance, testified that Great Dane manufactures
refrigerated trailers without any gutters or with gutters located in the front
of the trailer.  He also points to testimony from both Hofstetter and Greg
Scoggins, another representative for Great Dane, who testified about Adock plates@[8] that cover the
gutters in refrigerated trailers.  Finally, as evidence of a safer alternative
design, Champion points to his own testimony about his experience in the 1970s
and 1980s driving a refrigerated trailer with a mesh grate that covered the
rear gutter, a trailer that was not manufactured by Great Dane.[9]

1.  Alternative
Designs of a Trailer Without Any Gutters or with No Rear Gutter








As
evidence of an alternative design, Champion points to Hofstetter=s testimony that a refrigerated
trailer without any gutters would have reduced or eliminated the risk of injury
in this case.  Although Hofstetter testified that, at a customer=s request, Great
Dane had manufactured a refrigerated trailer with flat flooring and no gutters,
that design was an entirely different class of flooring for refrigerated
trailers, and unlike the trailer in this case, which featured ridged flooring. 
See, e.g., Allen v. W.A. Virnau & Sons, Inc., 28 S.W.3d 226,
232B33 (Tex. App.CBeaumont 2000,
pet. denied) (providing that safer alternative design did not diminish utility
of product involving same model tractor).  Furthermore, Scoggins testified that a trailer
without any gutter is not feasible in this type of trailer with ridged
flooring.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 82.005(b)(2) (requiring technological and
economic feasibility for an alternative design); Smith v. Aqua-Flo, Inc., 23 S.W.3d 473, 477
(Tex. App.CHouston [1st Dist.] 2000, pet. denied) (requiring separate proof for
technological and economic feasibility); see also Uniroyal Goodrich
Tire Co. v. Martinez, 977 S.W.2d 328, 335 (Tex. 1998) (providing that a safer
alternative design must be implemented without destroying the utility of the
product).  Champion claims he
is entitled to a reasonable inference as to economic feasibility of this design
even though he acknowledges in his appellate brief that Hofstetter did not
explicitly testify regarding the economic feasibility of a refrigerated trailer
without any gutters.  But because technological feasibility and economic feasibility
are different concepts, separate proof is required for each.  See Smith,
23 S.W.3d at 477.  Champion
points to no other evidence that an alternative design of a refrigerated
trailer with this type of ridged flooring but without any gutters was either
technologically or economically feasible when it left Great Dane=s control in 1999.  See
Tex. Civ. Prac. & Rem.
Code Ann. ' 82.005(b)(2) (requiring technological and
economic feasibility);
Smith, 23 S.W.3d at 477 (requiring separate proof for technological and
economic feasibility).  On this record, Champion has not produced evidence to show that this
alternative design would be a safer alternative design as contemplated by section
82.005(b).  See Tex. Civ. Prac.
& Rem. Code Ann. ' 82.005(b); Smith, 23 S.W.3d at 480B81 (concluding directed verdict on
design-defect claim was proper); see also General Motors Corp. v. Harper,
61 S.W.3d 118, 130, 133 (Tex. App.CEastland 2001, pet. denied)
(concluding evidence was legally insufficient to support a safer alternative
design).








Champion
claims he is entitled to a reasonable inference from the evidence that an
alternatively designed trailer without a rear gutter would have reduced or
eliminated the risk of pallet-jack wheels Afalling@ into the rear gutter.  Champion=s contention that utilization of this
alternative design might have avoided injuries does not prove that the trailer
was defective.  See Harper, 61 S.W.3d at 124B25.  In reference to the feasibility of
an alternative design with only a front gutter and no rear gutter, Hofstetter testified that
customers should be told of potential problems that may arise without a drain in
the rear.  Hofstetter acknowledged one problem with this design is that because
the trailer naturally slopes downward toward the rear, liquid can pool there. 
Hofstetter explained that without a rear gutter to drain the liquid, the
trailer=s refrigeration
system may cause the liquid to freeze, which would pose a potential hazard for
slipping or falling.  As
a general rule, a manufacturer should not be liable for failing to adopt an
alternative design that, in some circumstances, would impose an equal or
greater risk of harm.  See Uniroyal Goodrich Tire Co., 977 S.W.2d at
337B38.  To prevail on his design-defect
claim with this alternative design, Champion was required show that the safety
benefits from his proposed alternative design would not impose an equal or
greater risk of harm.  See id.  The safety benefits of the alternative
design must be Aforeseeably greater than the resulting costs, including any
diminished usefulness or diminished safety.@  Id.  Champion has not
pointed to any evidence that the safety benefits from this proposed alternative
design would not impose an equal or greater risk of harm.  See id. at
338.  Champion has not offered evidence to demonstrate that the alternative
design was as safe as the current design in terms of protecting from risk of
injury.  See Harper, 61 S.W.3d at 124B25.  Furthermore, Champion points to
no other evidence in the record that establishes this alternative design would
reduce the risk of injury without substantially impairing the utility of the
gutter for this trailer with ridged flooring.  See Tex. Civ. Prac. & Rem. Code Ann.' 82.005(b)(1); Harper, 61 S.W.3d at 128 (AUnsupported statements that an
alternative design would be safer is not evidence.@).  Champion has not met the burden
of showing that this alternative design would be a safer alternative design as
contemplated by section 82.005(b).  See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b); see also Smith, 23
S.W.3d at 480 (affirming directed verdict granted on design defect claim);
Harper, 61 S.W.3d at 130.

2.  Alternative
Designs of a Trailer with a Covered Gutter








Champion
claims he is entitled to a reasonable inference from the evidence that an
alternatively designed trailer with a covered rear gutter would have reduced or
eliminated the risk of pallet-jack wheels Afalling@ into the rear gutter.  He points to
his own trial testimony that a steel mesh covering[10]
like the covering he saw in the 1970s would have reduced the risk of the
hazard.  However, Champion acknowledged that the trailer in the 1970s was not
manufactured by Great Dane and that he did not use a pallet jack to unload
cargo at that time.  See, e.g., Allen, 28 S.W.3d at 232B33 (involving
safer alternative design implemented on same model tractor); see also Harper,
61 S.W.3d at 127 (concluding a test constituted no evidence that an alternative
design for seat-belt webbing would protect a driver from the principal risk of
impacting a steering wheel when test did not involve steering wheels or
steering columns).  The
fact that another manufacturer uses an alternative design may be evidence of
the technical feasibility of that design.  See Honda of Am. Mfg., Inc. v.
Norman, 104 S.W.3d 600, 607 (Tex. App.CHouston [1st Dist.] 2003, pet. denied). 
However, economic feasibility refers to the cost of producing a particular
design.  Id.  Absent testimony that an alternative design is
economically feasible, evidence suffices to support a directed verdict.  Smith,
23 S.W.3d at 477.  Even if we were to presume without deciding that Champion
was a qualified witness to testify to this alternative design, both Hofstetter
and Scoggins rejected the technological and economical feasibility of a metal
grate covering in refrigerated trailers designed by Great Dane.[11] 
See Smith, 23 S.W.3d at 477 (requiring separate proof for
technological and economic feasibility); see also Nissan Motor Co.,
Ltd.,
145 S.W.3d at 137 (indicating that expert testimony may be necessary to prove a
design defect). 
Hofstetter testified that a steel or aluminum grate for gutters in Great Dane=s trailers was
neither technologically nor economically feasible because such metals posed problems of corrosion, added extra
weight, and would need to be very thick to sustain heavy loads.  Champion does not point to any other
evidence that such grates would be technologically or economically feasible in
1999, when this trailer left Great Dane=s control.  See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(2); Smith, 23
S.W.3d at 478.  Therefore, Champion has not shown that this alternative design
would be a safer alternative design under section 82.005(b).  See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b); Smith, 23 S.W.3d
at 480; see also Harper, 61 S.W.3d at 130.








Finally,
Champion claims that use of the Adock plates@ manufactured by Great Dane would
have reduced or eliminated the risk of injury.  However,A[u]nsupported statements that an
alternative design would be safer is no evidence.@  Harper, 61 S.W.3d at 128. 
At trial, Hofstetter testified that alternative designs to prevent pallet jack
wheels from Afalling@ into the gutter could not be implemented without seriously affecting the
utility of the trailer=s ridged floor.  Hofstetter admitted that it was
technologically and economically feasible to manufacture dock plates, because
Great Dane manufactures such devices for other purposes, and installs them only
at a customer=s request.  However, Hofstetter and Scoggins each explained that dock
plates are evenly spaced across the threshold of the gutter, but not spanning
the entire gutter.  No evidence reflects that the use of dock plates, when used
as intended and spaced evenly over the gutter, would reduce or eliminate the
hazard of pallet-jack wheels Afalling@ into the gutter.  See Tex. Civ. Prac. & Rem, Code Ann. ' 82.005(b)(1); see, e.g.,
Harper, 61 S.W.3d at 130.  Therefore, Champion has not produced evidence to
show that this alternative design, featuring dock plates spaced evenly across
the gutter=s threshold, would be a safer alternative design as contemplated by
section 82.005.  See generally Tex.
Civ. Prac. & Rem Code Ann. ' 82.005; see also Harper, 61
S.W.3d at 130.  To the extent that Champion suggested at trial that dock
plates may be used to cover the gutter entirely, when shown a picture of a
gutter with a solid metal cover over the entire gutter, Hofstetter indicated
that such a design was not technologically feasible because the drains and
gutter need to be accessible for cleaning or else liquid will collect in the
floor and freeze.[12]  See Uniroyal Goodrich
Tire Co., 977 S.W.2d at 337 (providing that a manufacturer should not be liable for failing to adopt
an alternative design that would impose an equal or greater risk of harm); see
also Tex. Civ. Prac. & Rem. Code
Ann.' 82.005(b)(2)(requiring feasibility).  On this record, no
evidence reflects that the use of dock plates to cover the gutter entirely is a
safer alternative design under section 82.005(b).  See Tex. Civ. Prac. & Rem. Code Ann.' 82.005(b); Smith, 23 S.W.3d at 480;
see also Harper, 61 S.W.3d at 130.








Furthermore, the record contains no expert testimony that
any of the proposed alternative designs satisfied both requirements of
subsection 82.005(b) as a safer alternative design.  See Nissan Motor Co.,
Ltd., 145 S.W.3d at 137; see also Tex. Civ. Prac. & Rem.
Code Ann. ' 82.005.  Even presuming without deciding that Champion has met the
requirements of section 82.005(b), the requirements to prove a design defect
generally necessitate competent expert testimony and objective proof that a
defect caused the injury.  See Nissan Motor Co., Ltd., 145 S.W.3d at
137.  Although Champion suggested at submission that no expert witness was
necessary, as discussed above, no lay witness testimony established that any of
these alternative designs would meet all of the requirements of section 82.005Cparticularly in light of Champion=s own testimony at trial that (1) the
trailer=s ridged flooring and gutter did not
have any influence over his pallet jack or whether it would roll toward him;
and (2) had the lift gate platform not malfunctioned, the accident would not
have occurred.[13]  See Tex. Civ. Prac. & Rem. Code Ann.' 82.005(a)(2) (requiring proof of
producing cause).  In this case, no expert evidence established that the trailer
or gutter was the producing cause of Champion=s injuries, as
contemplated by subsection 82.005(a)(2)Cespecially when
considering evidence in the record that Champion=s palletized load
stabilized after encountering the gutter and before it was maneuvered onto the
lift gate platform.  See id.

Therefore, because on this record, no evidence of probative
force raised a fact issue on the material questions as to design defect, the
directed verdict in favor of Great Dane was proper.  See Prudential Ins. Co.
of Am., Inc., 29 S.W.3d at 77; Smith, 23 S.W.3d at 480. 
Accordingly, we overrule Champion=s first issue.








B.      Did the
trial court commit reversible error in excluding expert testimony?

In his second issue, Champion argues the trial court abused
its discretion in excluding the testimony of expert witness, Dr. Waymon
Johnston, regarding design defect.  Dr. Johnston testified briefly; however, the trial court
excluded his testimony as to defective design and permitted him to testify only
about marketing defects and warnings.  Dr. Johnston=s deposition testimony, however, was
included in the record for our review.

The trial court has broad discretion to determine the
admissibility of evidence; as such, a reviewing court will reverse only if
there is an abuse of that discretion.  Helena Chem. Co. v. Wilkins, 47
S.W.3d 486, 499 (Tex. 2001).  A trial court abuses its discretion only when it
acts in an unreasonable and arbitrary manner, or when it acts without reference
to any guiding principles.  Strauss v. Cont=l Airlines, Inc., 67 S.W.3d 428,
448 (Tex. App.CHouston [14th Dist.] 2002, no pet.).  We must uphold
the trial court=s evidentiary ruling if there is any
legitimate basis for it.  Owens-Corning Fiberglas Corp. v. Malone, 972
S.W.2d 35, 43 (Tex. 1998).

Texas Rule of Evidence 702, entitled ATestimony by
Experts,@ provides, AIf scientific,
technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness, qualified
as an expert by knowledge, skill, experience, training, or education may
testify thereto in the form of an opinion or otherwise.@  Tex. R. Evid. 702.  Expert testimony is
admissible if the expert is qualified and the testimony is relevant and based
on a reliable foundation.  Helena Chem. Co., 47 S.W.3d at 499.  Once the
party opposing the expert testimony objects, the proponent bears the burden of
demonstrating the admissibility of the testimony.  See E.I. du Pont de
Nemours & Co., Inc. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).  








Champion argues that the trial court excluded the expert=s testimony for
the improper reason that Dr. Johnston could not offer an opinion as to whether
the proposed safer alternative designs were technologically and economically
feasible or could reduce or eliminate risk without substantially impairing the
product=s utility, as
contemplated by section 82.005(b).  According to Champion, an expert was not
required to provide testimony on those elements because he offered this proof
through his own testimony and through Great Dane=s representatives. 
To the extent that we have determined above that Champion did not present this
evidence under section 82.005(b) through testimony from Champion or Great Dane=s representatives,
the requirements of design defect generally necessitate competent expert
testimony and objective proof that a defect caused the injury.  See Nissan
Motor Co., 145 S.W.3d at 137; DeGrate, 261 S.W.3d at 410B11.  We,
therefore, consider whether Dr. Johnston was qualified to offer an opinion as
to defective design.

The party calling the witness must show the expert is
qualified by having Aknowledge, skill, experience, training, or
education@ to testify on the specific issue before the court.  See
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998). 
Rule 702 permits expert testimony if such testimony would assist the trier of
fact in understanding the evidence or determining a fact issue.  Tex. R. Evid. 702; see Gammill,
972 S.W.2d at 718.  Whether an expert is qualified under Rule 702 is a
preliminary matter to be determined by the trial court.  See Gammill,
972 S.W.2d at 718.  A trial court Amust ensure that
those who purport to be experts truly have expertise concerning the actual
subject matter about which they are offering an opinion.@  Id. at
719 (quoting Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996)). AGeneral experience
in a specialized field is insufficient to qualify a witness as an expert.@  General
Motors Corp. v. Burry, 203 S.W.3d 514, 526 (Tex. App.CFort Worth 2006,
pet. abated).  If the expert is not qualified to offer a particular opinion in
a particular case, then the expert=s testimony is not
admissible because it does not rise above mere speculation, and, accordingly,
does not offer genuine assistance to the jury.  Broders v. Heise, 924
S.W.2d 148, 150B54 (Tex. 1996).








Champion asserts that the trial court incorrectly framed
the issue in evaluating Dr. Johnston=s qualifications
by requiring Dr. Johnston to be an expert in all aspects of refrigerated
trailer design.  Champion argues that the focus of this case was about a
particular design feature, the uncovered gutter of the trailer, and that Dr.
Johnston was well-qualified to discuss potential hazards associated with truck
drivers crossing the uncovered gutter in the course of a job duty.  The record
reflects that the trial court engaged in a lengthy discussion with the parties
outside of the jury=s presence about the admissibility of Dr.
Johnston=s testimony for
design defect.  In this exchange, the trial court characterized this case as
involving Aa refrigerated trailer with a specialized flooring
system and specialized drainage needs.@  On this basis,
the trial court did not require Dr. Johnston to be an expert in all aspects of
refrigerated trailer design.

Dr. Johnston holds advanced degrees in industrial
engineering and an undergraduate degree in mechanical engineering.  He is an
expert in product safety engineering and human factors engineering.  Over the
course of a twenty-four year career as the head of the Safety Engineering
Program at Texas A&M University, Dr. Johnston taught more than one thousand
graduate and undergraduate students in the fields of industrial safety
engineering, product safety engineering, and human factors engineering.  In
that capacity, he taught those students how to properly and safely design all
types of products for the workplace.  

Dr. Johnston equated the hazard posed in this caseCi.e., pallet-jack
wheels falling into the uncovered rear gutterCwith similar
hazards he had examined, including a gutter or crack in a sidewalk or walking
surface in which a child=s roller blade or wheel could become
lodged, or a wheel chair ramp.  Dr. Johnston characterized the hazard in this
case as Anothing more than
a gap in a walking surface, a surface that truck drivers have to walk across
and also have to run dollies and so forth.@  His solution was
to cover or fill the gutter.  Dr. Johnston acknowledged that he had not
designed and did not intend to design a safer alternative.  Champion sought to
use Dr. Johnston=s testimony to establish that the
alternative designs, as previously described at trial by Hofstetter and
Champion, met the requirements of section 82.002(b) in substantially reducing
or eliminating the risk of injury. 








As with one of the experts in the products-liability case Gammill
v. Jack Williams Chevrolet, Inc., Dr. Johnston in this case is not
qualified to offer testimony as to any alleged design defect with the trailer=s uncovered rear
gutter.[14] 
See 972 S.W.2d at 719.  AJust as not every physician is qualified
to testify as an expert in every medical malpractice case, not every mechanical
engineer is qualified to testify as an expert in every products liability case.@  Id.  Dr.
Johnston may have demonstrated his experience in designing workplace products
and in designing solutions for hazards in walking surfaces, but he was not
shown to have any training, experience, or special knowledge in the design or
manufacture of refrigerated trailers or their relevant components, i.e, the
rear uncovered gutter of refrigerated trailers that served a particular purpose
for the trailer=s drainage.  See id. at 718. 

Although Dr. Johnston held the same undergraduate degree in
mechanical engineering as some of Great Dane=s engineers, this
degree did not demonstrate that Dr. Johnston possessed specialized knowledge
about the refrigerated trailer=s uncovered gutter and drainage system.  See
id. (requiring an expert to possess special knowledge on the very matter
for which the opinion is offered).  Dr. Johnston=s deposition
revealed that he had participated in cases with accidents involving pallet
jacks and loading or unloading cargo in trailers.  However, he had no
experience or specialized knowledge involving uncovered gutters or alternative
designs for the gutters in refrigerated trailers.  On this record, Dr. Johnston
was not  shown to have any expertise that would qualify him to testify about
any alleged design defects in a refrigerated trailer=s uncovered gutter
or the proposed alternative designs.  See id. 








Dr. Johnston demonstrated no specialized knowledge
regarding the particular design of this uncovered gutter, and, accordingly, his
testimony as to Champion=s proposed alternative designs did not
rise above mere speculation.  See Broders, 924 S.W.2d at 150B54.  For this
reason, Dr. Johnston was not qualified to offer an opinion as to any alleged
design defect of the gutter at issue.  See
Tex. R. Evid. 702; Gammill,
972 S.W.2d at 719.  Therefore, the trial court did not abuse its discretion in
excluding Dr. Johnston=s testimony as to design defect.  See
Gammill, 972 at 719.  Because we conclude Dr. Johnston was not qualified
under Rule 702, we do not address the merits of whether the trial court
assessed the expert=s reliability under an improper standard. 
Accordingly, we overrule Champion=s second issue.

Having overruled Champion=s two issues on
appeal, we affirm the trial court=s judgment.        

 

 

 

 

/s/      Kem Thompson Frost

Justice

 

 

Panel consists of Chief Justice Hedges, Justice Frost, and
Senior Justice Hudson.*

 

 









[1]  Although Champion also asserted claims against
Penske and another party, the record reflects that Champion accepted settlement
offers from those two parties and that the claims against those parties were
dismissed with prejudice.





[2]  The parties used the terms Agutter@ or Adrain@
interchangeably in reference to this open space.  For consistency, we use the
term Agutter.@ 
The gutter measured approximately 2-1/3 inches wide and 1-1/4 inches deep.





[3]  The parties refer to a pallet jack as a
manually-operated piece of equipment that allows a single operator to place
fork-like arms beneath a pallet, lift the pallet with the aid of hydraulics,
and move the pallet on small wheels. 





[4]  Although he could not determine the source of the
noise, Champion said the noise could have been attributed to kinks in the chain
that attached the lift gate platform to the trailer. 





[5]  Champion had rested subject to calling Champion=s wife as a witness the following day.





[6]  Unless otherwise specified, all references to a Asection@
are to the Texas Civil Practice and Remedies Code. 





[7]  The record reflects that Great Dane representatives
discouraged use of pallet jacks on the type of ridged flooring found in this
refrigerated trailer because the pallet jacks damaged the floor.  Great Dane
manufactures refrigerated trailers with flat floors intended for use with
pallet jacks.





[8]  Although at trial the parties referred to two
different kinds of dock plates used by trailers, a Adock plate@ as
used in this circumstance is an L-shaped piece of metal that is several inches
wide.  The shorter piece of metal rests in the gutter of the trailer, and the
longer piece covers the open gutter and is tack-welded to the trailer=s ridged floor.  The dock plates are evenly spaced
across the threshold of the gutter to cover the gutter in spots, but not
entirely.  The dock plates were designed by Great Dane to protect the edges of
the ridged flooring where the ridged flooring meets the gutter when loading and
unloading cargo at a warehouse loading dock. 





[9]  At submission, Champion made reference to a fifth
alternative design, filling the gutter with square boxed tubing. Champion
claims evidence of this design was raised at trial through the testimony of a
representative of the manufacturer of the lift gate platform.  However,
Champion, in his appellate brief, neither identified nor addressed this fifth
alternative design and he has provided no analysis or citations to the
record or legal authorities as to this alternative design.  Therefore, Champion
has waived this issue.  See Tex.
R. App. P. 38.1(h); San Saba Energy, L.P. v. Crawford, 171 S.W.3d 323, 338 (Tex. App.CHouston [14 Dist.] 2005, no pet.)
(holding that, even though courts interpret briefing requirements reasonably
and liberally, a party asserting error on appeal still must put forth some
specific argument and analysis citing the record and authorities in support of
the party=s argument). 





[10]  Champion described this alternative design at trial
as a piece of steel or Awire mesh@
with diamond-shaped square holes.  





[11]  Champion=s
attorney questioned Hofstetter about an alternative design involving a metal
grate, made of aluminum or steel, which he described as being similar to a
grate used in a barbecue pit.





[12]  Furthermore, Hofstetter could not determine from the
picture whether the trailer in the photo had ridged flooring like the trailer
at issue in this case.  At submission, Champion suggested that Great Dane could
have manufactured wider dock plates to span the length of the gutter, leaving
only the ends of the gutter near the drain exposed.  Champion does not point to
evidence in the record that this design was raised as an alternative design at
trial.  Likewise, Champion did not identify this alternative design in his
appellate brief nor address how this design meets the requirements of section
82.005.  See Tex. R. App. P.
38.1(h); San Saba
Energy, L.P., 171
S.W.3d at 338.





[13]  In his appellate brief, Champion points to his
testimony at trial that the accident would not have occurred if the rear gutter
had been covered.  This testimony was in reference to the steel grate like the
one he saw in the 1970s.  As discussed above, Champion did not produce evidence
to establish that this alternative design met the requirements of section
82.005.





[14]  In contrast, a second expert witness in Gammill
was shown to be qualified to testify about defects concerning a rear seat belt
of the  automobile at issue.  See Gammill, 972 S.W.2d at 719.  Although
this second expert in Gammill, a licensed engineer, had a long academic
career, similar to Dr. Johnston in this case, this second expert researched
vehicle restraint systems, including systems like the one at issue, and had published
articles on the subject.  See id.  This expert testified in numerous
cases involving allegations of seat belt defects.  See id.  We factually
distinguish Dr. Johnston from this expert in Gammill because, as shown
in his deposition testimony, Dr. Johnston had not conducted research on
uncovered gutters in refrigerated trailers, nor had he published articles on
the subject or testified in any cases involving this type of allegation.  See
id.





*  Senior Justice J. Harvey Hudson sitting by
assignment.